IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Harvest Institute Freedman Federation, et al.,

Plaintiffs

v.

Dirk Kempthorne,
Department of the Interior, et al.[1/]

Defendants.

Judge Robert Hodges
06-907 L

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

MATTHEW J. MCKEOWN
Acting Assistant Attorney General

Daniel G. Steele
Attorney of Record for Defendant
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington D.C., 20044-0663
Tel: (202) 305 - 0484
Facsimile: (202) 305-0267

Of Counsel:
Jane Smith, Esquire
Attorney-Advisor
Bureau of Indian Affairs
United States Department of the Interior
1849 C Street
Washington, D.C. 20240

[1/] Given the distinct jurisdiction in this court, suits are brought against the "United States" as defendant (hereinafter, "United States" or "defendant") *Anderson Columbia Envir'l, Inc. v. United States*, 42 Fed. Cl. 880 (1999).

**TABLE OF CONTENTS**

Introduction ........................................................................................................ 1

Legal Background ................................................................................................ 2

The Seminole Treaty ........................................................................................ 2

The Creek Treaty ............................................................................................. 3

The Cherokee Agreement ................................................................................ 3

The Choctaw and Chickasaw Treaty ................................................................ 4

Standard of Review ............................................................................................... 5

Subject Matter Jurisdiction ................................................................................... 5

Failure to State a Claim ................................................................................... 5

Summary of Argument ..................................................................................... 6

Argument .............................................................................................................. 7

I. PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ........................................................................................ 7

II. PLAINTIFFS' CLAIMS FAIL TO INVOKE THE COURT'S JURISDICTION BECAUSE THEY HAVE NOT ALLEGED VIOLATIONS OF SPECIFIC STATUTES, REGULATIONS, OR TREATIES BY THE UNITED STATES ............................................... 10

A. The 1866 Treaties and Agreement Did Not Impose Money Mandating Obligations on the United States ........................................ 11

B. In the Alternative, Subsequent Land Allotments to the Freedmen Fulfilled Any Obligations the United States May Have Had to the Freedmen ............................................................... 12

III. DISMISSAL IS ALSO NECESSARY BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM ................................................................................ 13

A. The Seminole and Creek Treaties Did Not Entitle the Freedmen to Property ................................................................................................ 13

B. The Agreement of September 13, 1865 with the Cherokee Tribe

Does Not Provide for Land Conveyances ........................................................ 14

C. The Choctaw and Chickasaw Freedmen Were Not Entitled to Any Private Property Rights Because the Condition Precedent to Their Rights to Allotments Never Occurred ...................................................... 14

D. The Turn of the Century Allotment Agreements Superceded the Terms of the Treaties ......................................................................................... 15

IV. CLAIMS OF THE CHICKASAW FREEDMEN ARE BARRED BY THE DOCTRINE OF RES JUDICATA ................................................................... 16

V. THIS COURT LACKS THE POWER TO GRANT THE EQUITABLE RELIEF SOUGHT BY PLAINTIFFS .............................................................. 18

VI. THE HARVEST INSTITUTE AND BLACK INDIANS UNITED LEGAL DEFENSE AND EDUCATION FUND PLAINTIFFS HAVE FAILED TO ESTABLISH THEIR CONSTITUTIONAL STANDING TO ASSERT CLAIMS IN THIS CASE ........................................................................................ 19

Conclusion ................................................................................................................ 22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aldridge v. United States*,
59 Fed. Cl. 387 (2004) .......... 19, 20

*Andrade v. United States*,
485 F.2d 660 (1973), *cert. denied*, 419 U.S. 831 (1974) .......... 8

*Applegate v. United States*,
35 Fed. Cl. 406 (1996) .......... 20

*Bear v. United States*,
810 F.2d 153 (8th Cir. 1987) .......... 17

*Blaze Const., Inc. v. United States*,
27 Fed. Cl. 646 (Fed. Cl. 1993) .......... 9

*Brown v. United States*,
105 F.3d 621 (Fed. Cir. 1997) .......... 19

*Burlison v. United States*,
2007 WL 925349 *4 (Fed. Cl. 2007) .......... 6

*Casey-El v. United States*,
951 F.2d 1267 (Fed. Cir. 1991) (unpublished opinion) .......... 18

*Choctaw Nation of Indians v. United States*,
318 U.S. 423 (1943) .......... *passim*

*Cobell v. Norton*,
392 F.3d 461 (D.C. Cir 2004), *vacated on other grounds*, 428 F.3d 1070 (2005) .......... 11

*Conley v. Gibson*,
355 U.S. 41 (1957) .......... 6, 13

*Emerald Int'l Corp. v. United States*,
54 Fed. Cl. 674 (2002) .......... 19, 20

*Entergy Nuclear Indian Point 2, LLC v. United States*,
64 Fed. Cl.515 (2005) .......... 20

*Fallini v. United Sates*,
56 F.3d 1378 (Fed. Cir. 1995), *cert. denied*, 517 U.S. 1243 (1996) .......... 8

*Federated Department Stores v. Moitie*,
452 U.S. 394 (1981) ........................................................................................ 18

*First Hartford Corp. Pension Plan & Trust v. United States*,
194 F.3d 1279 (Fed. Cir. 1999) ........................................................................ 22

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005) (en banc) ........................................................ 10

*Fort Mojave Tribe v. United States*,
210 Ct. Cl. 727 (1976) ...................................................................................... 8

*Gritts v. Fisher*,
224 U.S. 640 (1912) ........................................................................................ 14

*Hopland of Pomo Indians v. United States*,
855 F. 2d 1573 (Fed. Cir. 1988) ........................................................................ 7

*Hydaburg Cooperative Ass'n v. United States*,
229 Ct. Cl. 250 (1981) ...................................................................................... 8

*In re: Crash at Dallas/Fort Worth*,
861 F. 2d 814 (5th Cir. 1988) .......................................................................... 17

*Jones v. United States*,
801 F.2d 1334 (Fed. Cir. 1986), *cert. denied,* 481 U.S. 1013 (1987) ............................... 8

*Kent v. N. Cal. Reg'l Office of the Am. Friends Serv. Comm.*,
497 F.2d 1325 (9th Cir.1974) .......................................................................... 21

*Lebeau v. United States*,
474 F.3d 1334 (Fed Cir. 2007) ........................................................................ 12

*Leonardo v. United States*,
55 Fed. Cl. 344 (2003) ...................................................................................... 5

*Library of Congress v. Shaw*,
478 U.S. 310 (1986) ........................................................................................ 20

*Littlewolf v. Hodel*,
681 F. Supp. 929 (D.D.C. 1988) ........................................................................ 8

*Littlewolf v. Lujan*,
877 F.2d 1058 (D.C. Cir. 1989) ........................................................................ 8

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 20, 21

*Menominee Tribe v. United States*,
726 F.2d 718 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 826 (1984) .......... 8

*Murray v. United States*,
817 F.2d 1580 (Fed. Cir. 1987) .......... 19

*Nager Electric Co. v. United States*,
368 F.2d 847 (Ct. Cl. 1966) .......... 8

*Navajo Tribe of Indians v. State of N.M.*,
809 F. 2d 1455 (10th Cir. 1987) .......... 9

*Navajo Tribe of Indians v. United States*,
9 Cl. Ct. 227 (1985) .......... 12

*Naylor v. United States*,
53 Fed. Cl. 172 (2002) .......... 18

*Neitzke v. Williams*,
490 U.S. 319 (1989) .......... 5, 6

*Nevada v. United States*,
463 U.S. 110 (1983) .......... 17, 18

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979) .......... 18

*Pawnee v. United States*,
830 F.2d 187 (Fed. Cir. 1987) .......... 10

*Renne v. Geary*,
501 U.S. 312 (1991) .......... 5

*Robertson v. United States*,
7 Cl. Ct. 155 (1984) .......... 17

*Rocovich v. United States*,
933 F.2d 991 (Fed. Cir. 1991) .......... 5

*Ross v. Ickes*,
130 F. 2d 415 (D.D.C 1942) .......... 4

*Ruttenburg v. United States*,
65 Fed. Cl. 49 (2005) .......................................................................................... 20

*Secretary of State of Maryland v. Joseph H. Munson Co.*,
467 U.S. 947 (1984) ............................................................................................. 22

*Short v. United States*,
12 Cl. Ct. 36 (Cl. Ct. 1987) ........................................................................... 13, 14

*Shoshone-Bannock Tribes v. Reno*,
56 F.3d 1476 (D.C. Cir. 1995) ............................................................................ 11

*Silicon Image v. Genesis Microchip*,
395 F.3d 1358 (Fed. Cir. 2005), *aff'd*, 176 Fed. Appx. 109 (2006) ................................ 15

*Sindram v. United States*,
67 Fed. Cl. 788 (2005), *aff'd*, 2006 U.S. App. LEXIS 6953 (Fed. Cir.) ........................... 5

*United States Dep't of Energy v. Ohio*,
503 U.S. 607 (1992) ............................................................................................... 5

*United States v. Choctaw Nation*,
193 U.S. 115 (1904) ....................................................................................... *passim*

*United States v. Dow*,
357 U.S. 17 (1958) ........................................................................................ 20, 22

*United States v. King*,
395 U.S. 1 (1969) .......................................................................................... 18, 19

*United States v. Mitchell ("Mitchell I")*,
445 U.S. 535 (1980) ........................................................................................ 10, 11

*United States v. Mitchell* ("*Mitchell II*"),
463 U.S. 206 (1983) ........................................................................................ 10, 11

*United States v. Navajo Nation*,
537 U.S. 488 (2003) ............................................................................................. 10

*Warth v. Seldin*,
422 U.S. 430 (1975) ............................................................................................. 22

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*,
443 U.S. 658 (1979) ............................................................................................. 13

*White Buffalo Constr., Inc. v. United States*,
52 Fed. Cl. 1 (2002) .......... 18,19

*Whitefoot v. United States*,
293 F.2d 658 (Ct. Cl. 1961), *cert. denied*, 369 U.S. 818 (1962) .......... 13, 14

*Wilson v. Omaha Indian Tribe*,
442 U.S. 653 (1979) .......... 13

*Wolfchild v. United States*,
62 Fed. Cl. 521 (2004) .......... 7

*Xechem Int'l. V. Univ. Of Texas. M.D. Anderson Cancer Ctr.*,
382 F.3d 1324 (Fed. Cir. 2004), *cert. denied*, 543 U.S. 1149 (2005) .......... 6

FEDERAL STATUTES

14 Stat. 755 .......... 2, 3
14 Stat. 769 .......... 4
14 Stat. 770 .......... 14
14 Stat. 785 .......... 3
14 Stat. 799 .......... 2
28 U.S.C. § 1491 .......... 10
28 U.S.C. § 1491(b)(2) .......... 19
28 U.S.C. § 1505 .......... 10
28 U.S.C. § 2501 .......... 6-9
30 Stat. 496 .......... 3, 4
30 Stat. 505 .......... 14
30 Stat. 506 .......... 4
30 Stat. 567 .......... 3
30 Stat. 569 .......... 9, 16
31 Stat. 861 .......... 3
31 Stat. 872 .......... 9, 16
32 Stat. 641 .......... 5, 14, 16
32 Stat. 656 .......... 9
42 U.S.C. 7901 .......... 12

FEDERAL RULES

RCFC 12(b)(1) .......... 6, 10
RCFC 12(b)(6) .......... 5, 6, 10, 14

OTHER AUTHORITIES

6 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 1542. .......... 21

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**Introduction**

The Harvest Institute Freedman Federation, an organization "formed to pursue legal redress and to vindicate the civil and property rights of the descendants of former slaves of both African and Indian ancestry . . . ." (Complaint ("Compl.") at 2)) and William Warrior, "a descendant of such Black Indians and a representative of the entire class of such persons, a class too numerous to list individually as plaintiffs in this action" (id.), and the Black Indians United Legal Defense and Education Fund, "an organization formed to provide structural educational and policy guidance to the descendants of Black Indians concerning their status in relation to Native Americans, the States, and the United States" (id.) are the named plaintiffs ("plaintiffs") in this action. The plaintiffs seek, inter alia, an order certifying a class of plaintiffs, yet unidentified, declaratory and injunctive relief, issuance of a writ of mandamus, and in the alternative, monetary relief.

Plaintiff, William Warrior ("principal plaintiff") asserts that he is the lineal descendent of an ancestor who was an enslaved member of a component part of the Seminole Nation. In this capacity, the individual plaintiff alleges that, for him, the Treaty of March 21, 1866 provided "for conveyances of land and other benefits for qualifying Black Indians" (Compl. at 7) upon their emancipation from slavery. The principal plaintiff further alleges that ". . . the United States did not cause the expressly agreed upon land conveyances to occur as these parcels were not conveyed to Black Indians as mandated . . .." Id. As a proposed class representative, the principal plaintiff also asserts similar alleged claims of aggrieved unnamed individuals from the Seminole, Creek, Choctaw, Chickasaw, and Cherokee Nations. Whereas the plaintiffs' alleged claims are purportedly derived from treaty obligations of the United States, the following section is intended to provide a brief legal background of the Treaties cited in the Plaintiffs' Complaint.

## Legal Background

During the Civil War, the Five Civilized Tribes[2] entered into treaties with the Confederacy, severing their relations with the United States. On September 10, 1865, the United States entered into an unratified treaty with them by which the Tribes renewed their allegiance to the United States. *United States v.Choctaw Nation*, 193 U.S. 115, 116 (1904). The following year, in 1866, the United States made treaties with each of the Five Civilized Tribes, setting the terms on which the tribes would continue to exist within the United States. All of the treaties with the Five Civilized Tribes eradicated slavery within the tribes and provided that the emancipated "Freedmen" would have certain rights within the tribes. Although these Treaties had a common purpose, the provisions of the various Treaties were not identical. The following excerpts and summaries of each treaty's language are relevant to subsequent agreements that superseded the treaties and to the plaintiffs' claims.

**The Seminole Treaty:**

The United States entered into its first antebellum treaty with the Seminole in1866. 14 Stat. 755. This treaty did not provide specific property rights to the Freedmen. Rather, the treaty provided that the Freedmen members would have rights equal to those of Seminoles by blood:

> And inasmuch as there are among the Seminoles many persons of African descent and blood, who have no interest or property in the soil, and no recognized civil rights, it is stipulated that hereafter these persons and their descendants, and such other of the same race as shall be permitted by said nation to settle there, shall have and enjoy all the rights of native citizens, and the laws of said nation shall be equally binding upon all persons of whatever race or color who may be adopted as citizens or members of said tribe.

---

[2] The Seminole, Cherokee, Creek, Choctaw and Chicksaw tribes comprise the Five Civilized Tribes. Although the Plaintiffs cite an unratified agreement with the Cherokee of September 13, 1865 (Compl. at 7), Plaintiffs make no other reference to the agreement or the Cherokee in the Complaint. Taking the complaint on its face, the Plaintiffs do not assert a claim under the 1866 Treaty with the Cherokee. *See* 14 Stat. 799.

14 Stat. 755, 756. In 1898, the Seminole entered into an agreement with the United States to allot its land held in common to individual members. 30 Stat. 567. The agreement made no distinction between the Freedmen members and the members by blood. Freedmen members, like members by blood, received allotments under this agreement.

**The Creek Treaty:**

The United States' treaty with the Creek is similar to its treaty with the Seminole. It did not provide for specific property rights for the Freedmen. Rather, it provided that the Creek Freedmen would have all the rights of members by blood, including the right to share equally in land and funds:

> [A]nd inasmuch as there are among the Creeks many persons of African descent, who have no interest in the soil, it is stipulated that hereafter those persons lawfully residing in said Creek country under their laws and usages . . . shall have and enjoy all the rights and privileges of native citizens, including an equal interest in the soil and national funds, and the laws of said nation shall be equally binding upon and give equal protection to all such persons, and all others, of whatever race or color, who may be adopted as citizens or members of said tribe.

14 Stat. 785, 786. In 1897, the United States and the Creek Nation agreed to terms on which the Creek Nation's common lands would be allotted. 30 Stat. 496, 514. The agreement made no distinction between Creeks by blood and the Freedmen. In 1901, the Creek entered a second agreement with the United States. 31 Stat. 861. Like the first, this agreement made no distinction between Creek Indian and Freedmen members. The Creek Freedmen received their allotments on the same terms as the Creek members by blood.

**The Cherokee Agreement:**

Although the United States entered into a treaty with the Cherokee in 1866, the plaintiffs do not cite it as a basis for their claims. Instead, they cite an unratified agreement with the Cherokee and other tribes in Indian Territory made in 1865. Exhibit A. The agreement reestablished the relationships of the United States with the tribes that had sided with the

Confederacy during the Civil War. It does not address Freedmen or property rights.[3]

**The Choctaw and Chickasaw Treaty:**

The United States entered into a treaty with the Choctaw and Chickasaw Tribes on April 28, 1866. 14 Stat. 769. This treaty provided that the tribes had a choice about how to deal with their Freedmen. If the tribes made their Freedmen members within two years, the tribes would receive a portion of a trust fund, and the Freedmen would receive 40-acre allotments once the Choctaw, Chickasaw, and Kansas Indians had made their selections. *Id*. If the tribes did not adopt their Freedmen and the Freedmen voluntarily removed themselves to other land within Indian Territory, the tribes would get nothing and the Freedmen would receive a portion of the trust fund. *Id*. The Choctaw and Chickasaw resisted adopting the Freedmen, so the Freedmen were not entitled to the 40-acre allotments.[4] In 1883, the Choctaw adopted the Freedmen into the tribe and declared each was entitled to 40 acres. The tribe made no allotments at that time either. *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 425 (1943). The Chickasaw never did adopt their Freedmen into the tribe. *Id*.

In 1897, the United States entered into an agreement with the Choctaw and Chickasaw whereby their lands held in common would be allotted. 30 Stat. 496, 505- 506. This agreement provided that the Choctaw Freedmen would receive 40-acre allotments. 30 Stat. 506. Before

---

[3] Although not mentioned in the Plaintiffs' Complaint, a Treaty with the Cherokee Tribe and the United States was concluded on July 19, 1866. Article IV of that Treaty provided that ". . . [a]ll of the Cherokee freed negroes who were formerly slaves to any Cherokee, and all free negroes not having been slaves, who resided in the Cherokee nation prior to June 1, 1861 . . . shall have the right to settle in and occupy the Canadian district . . . and will include a quantity of land equal to 160 acres for each person who may so elect to reside in the territory . . . ." Thus, as in the case of the Choctaw and Chickasaw Freedmen, the Cherokee Freedmen were "adopted into the tribe [and] [c]onsequently, they and their descendants were entitled to participate in the allotment of lands equally with members of the tribe by blood." *Ross v. Ickes*, 130 F.2d 415 (D.C.C. 1942).

[4] Neither the Freedmen nor the Indian members of the tribe received allotments. *See, Choctaw Nation of Indians v. United States*, 318 U.S. 423, 425 (1943).

any allotments were made, the United States entered into another agreement with the tribes. This second agreement also provided that Choctaw and Chickasaw Freedmen would receive 40 acres. 32 Stat. 641. Unlike earlier attempts at allotting the tribes' land, this attempt was successful.

While the Choctaw and Chickasaw treaty provided conditional property rights, none of the other treaties entitled the Freedmen to individual property rights. All of the Freedmen did receive allotments under their tribes' allotment agreements with the United States at the turn of the 20th century.

**Standard of Review**

**Subject Matter Jurisdiction:**

Rules of the Court of Federal Claims ("RCFC"), Rule 12(b)(1) provides for dismissal of claims if the Court lacks jurisdiction over the subject matter of the claims. The Supreme Court presumes that federal courts lack jurisdiction, unless the contrary appears affirmatively from the record. *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 614 (1992); *Renne v. Geary*, 501 U.S. 312, 315 (1991). "A party seeking the exercise of jurisdiction in its favor has the burden of establishing that such jurisdiction exists." *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991) (citing *KVOS, Inc. v. Associated Press*, U.S. 269, 278 (1936)). "Subject matter jurisdiction is strictly construed." *Leonardo v. United States*, 55 Fed. Cl. 344, 346 (2003). Under Fed. R. Civ. P. 12(b)(1), the Plaintiffs bear the burden of establishing the court's jurisdiction by a preponderance of the evidence. *Sindram v. United States*, 67 Fed. Cl. 788 (2005), *aff'd, 2006 U.S. App. LEXIS 6953* (Fed. Cir. 2006).

**Failure to State a Claim:**

RCFC 12(b)(6) also forms a basis for dismissal of Plaintiffs' claims. Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984);

*Conley v. Gibson*, 355 U.S. 41 (1957)). "[I]f as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,' a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke*, 490 U.S. at 327 (quoting *Hishon*, 467 U.S. at 73).

Thus, claims should be dismissed under Rule 12(b)(6) where, as here, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his legal claim which would entitle him to relief." *Conley*, 355 U.S. at 45. In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must take the well-pleaded allegations of the complaint as true and draw all reasonable factual inferences in the plaintiffs' favor. *Xechem Int'l. V. Univ. Of Texas. M.D. Anderson Cancer Ctr.*, 382 F.3d 1324, 1326 (Fed. Cir. 2004), *cert. denied*, 543 U.S. 1149 (2005). "If a defendant or the court challenges jurisdiction or plaintiffs' claim for relief, however, the plaintiffs cannot rely merely on allegations in the complaint, but must instead bring forth, relevant, competent proof to establish jurisdiction." *Burlison v. United States*, 2007 WL 925349 *4 (Fed. Cl. 2007) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)) (additional citations omitted).

**Summary of Argument**

The plaintiffs' complaint is subject to dismissal for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) on two grounds: First, pursuant to the statute of limitations, 28 U.S.C. § 2501, the alleged claims accrued, if at all, many years ago; and second, plaintiffs cannot assert any basis to support the allegation that the United States breached any trust responsibilities by failing to assure that land conveyances occurred (Compl. at 7). Plaintiffs' complaint is also subject to dismissal for failure to state claims pursuant to RCFC 12(b)(6) on three grounds: First, the 1866 treaties with the Seminole and Creek Tribes and the 1865 agreement with the Cherokee Tribe did not provide any individual property rights to the Freedmen; second, the Chocktaw and

Chickasaw Freedmen are not entitled to any land under the 1866 treaty because the condition precedent to their receipt of allotments never occurred; and third, to the extent that the 1866 treaties could be interpreted as providing for land conveyances to the Freedmen, subsequent agreements at the turn of the century superseded the terms of those treaties and agreement.

Defendant will further demonstrate that the Chickasaw plaintiffs' claims are barred by the doctrines of res judicata and collateral estoppel because their ancestors, with whom they are in privity, brought the same causes of action in prior court proceedings. Other grounds for dismissal are pursuant to the plaintiffs' prayers for a declaratory judgment, injunctive relief, and mandamus (Compl. 7-8), remedies which are clearly beyond this Court's jurisdiction. Finally, defendant moves to dismiss two named parties, the Harvest Institute and the Black Indians United Legal Defense and Education Fund. These entities do not have standing to assert any claims in this lawsuit.

## Argument

### I. PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

This Court lacks subject matter jurisdiction over all of the Plaintiffs' claims because, pursuant to 28 U.S.C. § 2501, these claims exceed the time provided for in the statute of limitations to bring suit. Claims against the United States in the Court of Federal Claims must be filed within six years of the accrual of the cause of action. 28 U.S.C. § 2501. "This statute of limitations is a jurisdictional limitation on the government's waiver of sovereign immunity and therefore must be construed strictly." *Wolfchild v. United States*, 62 Fed. Cl. 521, 547 (2004) (citing *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988)). "Exceptions to the limitations and conditions upon which the government consents to be sued are not to be implied." *Hopland Band*, 855 F.2d at 1577 (citing *Soriano v. United States*, 352 U.S. 270, 276 (1957)). "Furthermore, since the 6-year limitations period of Section 2501

serves as a jurisdictional limitation rather than simply as an affirmative defense, such statutes of limitations have been held as "not capable of waiver or subject to an estoppel," whether pled or not." *Id*. (citations omitted).

In deciding the issue of dismissal on the statute of limitations ground, the Court must focus on a "*first accrual*," the 28 U.S.C. § 2501 condition on the waiver of sovereign immunity. Accordingly, the relevant question is when did events first transpire entitling the claimant to bring suit alleging the breach. *Nager Electric Co. v. United States*, 368 F.2d 847, 851 (Ct. Cl. 1966). The Plaintiffs are not required to know all of the facts, or the cause of action, before the statute begins to run. *Fallini v. United Sates*, 56 F.3d 1378, 1380 (Fed. Cir. 1995), *cert. denied*, 517 U.S. 1243 (1996) (citing *Menominee Tribe v. United States*, 726 F.2d 718, 721 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 826 (1984). Indeed, it is when the operative facts exist and are not inherently unknowable that dictates first accrual. *Menominee Tribe v. United States*, 726 F.2d at 720-22 (Fed. Cir. 1988). The date of ordinary accrual for a breach of statutory or regulatory duty is when the wrong began. *See Menominee*, 726 F.2d at 721; *see also Jones v. United States*, 801 F.2d 1334, 1335 (Fed. Cir. 1986), *cert. denied*, 481 U.S. 1013 (1987). The rationale of this rule is that an Indian beneficiary, no less than anyone else, is charged with notice of whatever facts an inquiry appropriate to the circumstances would have uncovered. *See, e.g.*, *Littlewolf v. Hodel*, 681 F. Supp. 929, 942 (D.D.C. 1988), *aff'd sub non*., *Littlewolf v. Lujan*, 877 F.2d 1058 (D.C. Cir. 1989). This principle is equally applicable to claims for money damages brought in the Court of Claims. *Menominee, supra.; Hydaburg Cooperative Ass'n v. United States*, 229 Ct. Cl. 250 (1981); *Andrade v. United States*, 485 F.2d 660, 661 (1973) *cert. denied*, 419 U.S. 831 (1974); *Fort Mojave Tribe v. United States*, 210 Ct. Cls. 727, 728 (1976).

Assuming *arguendo* a proper basis of the Plaintiffs' claims grounded in the 1866 treaties

and Cherokee agreement, a matter that defendant herein disputes, 28 U.S.C. § 2501 bars the Plaintiffs' present claims and, without more, should result in the dismissal of this case. The Choctaw, Chickasaw, Seminole, Creek, and Cherokee Freedmen claims all accrued, at the latest, at the turn of the century when the parties agreed to supercede those treaties and agreement to the extent they were inconsistent with the allotment agreements. *See, e.g., Navajo Tribe of Indians v. State of N.M.*, 809 F. 2d 1455, 1471 (10th Cir. 1987). ("Tribe simply cannot pretend that the issuance of both the Executive Orders and land patents never occurred, so that no claim against the United States arose before it decided to bring suit in 1982. ").

Notably, the plaintiffs offer very few details concerning when they believe their claims began to accrue. "Conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Blaze Const., Inc. v. United States*, 27 Fed. Cl. 646, 650 (Fed. Cl. 1993) (quoting *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981), *aff'd*, 460 U.S. 325 (1983)). Applying the "*first accrual*" standard, it is clear on the face of plaintiffs' Complaint that such claims accrued many years ago, clearly exceed the six year statute of limitations, and are barred under 28 U.S.C. § 2501. All of the allotment agreements contained provisions that superseded inconsistent provisions of the 1866 treaties. 30 Stat. 569 (Seminole); 31 Stat. 872 (Creek); 32 Stat. 656 (Choctaw and Chickasaw). In *Choctaw Nation*, the Supreme Court held that the Choctaw and Chickasaw allotment agreements superseded the terms on which the tribes would provide allotments to the Freedmen. *Choctaw Nation*, 318 U.S. at 428. Like the Choctaw and Chickasaw treaty, the Seminole and Creek treaties were superceded by the tribes' allotment agreements to the extent the agreements were inconsistent with them. If the Freedmen received rights to enjoy the tribes' common land under the 1866 treaties, the property rights to allotments received under the allotment agreements necessarily superseded those rights by providing allotments.

Applying statute of limitations principles, Congress's ratifying and executing the allotment agreements was the last event that occurred that fixed the Government's purported liability under the treaties. The plaintiffs' claims accrued at the turn of the twentieth century when the allotment agreements superseded the treaties as to Freedmen property.

## II. PLAINTIFFS' CLAIMS FAIL TO INVOKE THE COURT'S JURISDICTION BECAUSE THEY HAVE NOT ALLEGED VIOLATIONS OF SPECIFIC STATUTES, REGULATIONS, OR TREATIES BY THE UNITED STATES

Plaintiffs assert the Court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491, and the "Indian Tucker Act," 28 U.S.C. § 1505. To state a cognizable claim for money damages against the United States under either Statute, a plaintiff "must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *United States v. Mitchell*, 463 U.S. 206, 216-17 (1983) ("*Mitchell II*") (internal quotation marks omitted); *United States v. Navajo Nation*, 537 U.S. 488, 506, 512.[5/] A claimant invoking the Court's jurisdiction on the basis that the United States has breached its trust responsibility must identify a statute, treaty, or regulation that imposes a specific fiduciary duty on the United States. *United States v. Mitchell*, 445 U.S. 535, 542-43 (1980) ("*Mitchell I*"). Here, plaintiffs assert that the United States has breached its trust responsibilities by failing to assure that land conveyances occurred under the 1866 Treaties and the Cherokee Agreement (Compl. at 7). However, as shown below, the plaintiffs have not and cannot sustain their burden of demonstrating, first, that the Treaties and Cherokee Agreement, by

---

5/ Defendant's positions concerning the RCFC 12(b)(1) jurisdictional defects of Plaintiffs' Complaint overlap with its RCFC 12(b)(6) positions regarding Plaintiffs' failure to state claims. This Court sometimes has characterized a failure to state a claim within this court's jurisdiction as a failure to state a cognizable claim rather than a lack of subject-matter jurisdiction. *See Pawnee v. United States*, 830 F.2d 187, 192 n.7 (Fed. Cir. 1987). In *Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005) (en banc), however, the Court clarified that if a separate source of substantive law is not found to create a right to money damages, the appropriate disposition of such cases is a dismissal for lack of jurisdiction. *Id.* at 1173.

themselves, imposed trust money mandating duties on the United States to convey lands to the Freedmen and second, assuming that the Treaties and Cherokee Agreement imposed money mandating duties, that the United States failed to fulfill those duties. In either case, plaintiffs cannot sustain their burden.

### A. The 1866 Treaties and Agreement Did Not Impose Money Mandating Obligations on the United States

In order to state a claim for breach of trust, the plaintiffs must plead or otherwise identify specific and legally cognizable claims defining fiduciary duties emanating from statutes, treaties, executive orders, regulations, or similar law on the United States. *See Cobell v. Norton*, 392 F.3d 461, 471 (D.C. Cir 2004), *vacated on other grounds*, 428 F.3d 1070 (2005); *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995) (citing *Mitchell I* and *United States v. Mitchell*, 463 U.S. 206 (1983) (*Mitchell II*). Although common law trust duties may inform the interpretation of statutory mandates, it does not provide an independent basis for judicial action. *Cobell*, 392 F.3d at 471. Taking into consideration the content of each Treaty and the Cherokee agreement, one by one, Plaintiff cannot point to any specific duties expressed therein which the United States has breached.

As discussed in detail above, nowhere in the 1866 Treaties with the Creeks, Seminoles, or in the agreement with the Cherokees is there any mention of a duty by the United States to see that the tribes convey private property to their Freedmen. In the absence of express language obligating the Government to do what plaintiffs claim the United States had an obligation to do, there can be no basis to sustain the Complaint with regard to these tribes. Such claims with regard to the Creek, Seminole, and Cherokee Freedmen must be dismissed.

Although the Choctaw and Chickasaw Treaty did provide for allotments of forty acres each to their Freedmen, that Treaty also contained conditions on the Tribes' obligation to allot

the land to the Freedmen. To summarize, their receipt of forty-acre allotments was subject to the Tribes adopting the Freedmen as tribal members, making tribal land selections first, and that that be accomplished within two-years after the Treaty's ratification. The Choctaws adopted their Freedmen in 1883, well beyond the two year period. The Chickasaws never adopted their Freedmen. So, as to the Choctaws and Chickasaws, the conditions precedent contained in the 1866 Treaty were not executed pursuant to the terms of the treaties and, therefore, Plaintiffs cannot now assert that the United States has breached Treaty provisions that, fairly interpreted, mandate compensation in this Court.

### B. In the Alternative, Subsequent Land Allotments to the Freedmen Fulfilled Any Obligations the United States May Have Had to the Freedmen

As discussed above, at the turn of the century four allotment Acts allotted lands to the members of the tribes, including the Freedmen. The allotment agreements superseded the 1866 treaties that were inconsistent.

Regardless of whether the Freedmen secured what they believed they were entitled to receive under the terms of the treaties, the subsequent allotments to them at the turn of the 21st century, consistent with the terms of the allotment Agreements and enacting legislation, are all that the Freedmen could conceivably recover. The allotment Agreements gave all that Congress intended. No right to damages based on a presumed breach of trust can be premised on a recovery not intended by Congress. *See Lebeau v. United States*, 474 F.3d 1334, 1343 (Fed Cir. 2007); *see also Navajo Tribe of Indians v. United States*, 9 Cl. Ct. 227, 268-270 (1985), *appeal dismissed* (Fed. Cir. 1987) (Uranium Mill Tailings Radiation Control Act, 42 U.S.C. 7901 *et seq.*, resolved claim eliminating need for court mandated relief). In light of the turn of the 20th century allotment agreements under which Freedmen of all five tribes received allotments consistent with the terms of the allotment Agreements and congressional ratification, plaintiffs

have failed to state a claim for the recovery of damages for any alleged breach of fiduciary duty by the United States.

## III. DISMISSAL IS ALSO NECESSARY BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM

Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law when, as here, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his legal claim which would entitle him to relief." *Conley*, 355 U.S. at 45. Plaintiffs have not met their burden in this regard. As discussed below, the treaties and Cherokee agreement, the only bases of Plaintiffs' Complaint, cannot be shown to sustain plaintiffs' claims.

### A. The Seminole and Creek Treaties Did Not Entitle the Freedmen to Property

The Plaintiffs claim that treaties with the Seminole and Creek Tribes conveyed "land and other benefits to the liberated persons of African ancestry." Compl. at 7. In support of this claim, the plaintiffs' Complaint cites to 1866 treaties. *Id.* However, nowhere do these treaties with the Seminole and Creek Tribes provide for, or even suggest, land conveyances to the Freedmen as the plaintiffs allege. As demonstrated by the language of these treaties, recited above, each 1866 Treaty simply provided in almost identical language, that the Freedmen and their descendants would have equal interests in property with the Indians and would be adopted as citizens and members. Thus, the Seminole and Creek Freedmen were merely provided equal rights, including equal rights to tribal common property with their respective Tribal members – not independent promises of private property.

Tribal property interests and governmental authority flow from reserved treaty rights and are secured to recognized Indian tribes as distinguished from individual Indians. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 679 (1979); *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 665 (1979); *see also Whitefoot v. United States*,

293 F.2d 658 (Ct. Cl. 1961), *cert. denied*, 369 U.S. 818 (1962). As explained in *Short v. United States*:

> An individual Indian's rights in tribal or unallotted property arises only upon individualization; individual Indians do not hold vested severable interests in unallotted tribal lands and monies as tenants in common.

12 Cl. Ct. 36, 42 (Cl. Ct. 1987) (citing *United States v. Jim*, 409 U.S. 80, 82-83 (1972); *Gritts v. Fisher*, 224 U.S. 640, 642 (1912)) (additional citations omitted). Plaintiffs have failed to state claims as to the Freedmen members of these Tribes as RCFC 12(b)(6) requires.

**B. The Agreement of September 13, 1865 with the Cherokee Tribe Does Not Provide for Land Conveyances**

The Cherokee Agreement reestablished relations between the United States and the tribes in Oklahoma that had supported the Confederacy. It does not even mention Freedmen or property. Thus, Plaintiffs have failed to state a claim pursuant to RCFC 12(b)(6) as to the Cherokee Tribe.

In summary, the plaintiffs' claims as to the Seminole and Creek treaties and the Cherokee agreement should be dismissed because, even taking the allegations of the complaint as true, the treaties and Agreement did not provide for any property rights to the tribal lands.

**C. The Choctaw and Chickasaw Freedmen Were Not Entitled to Any Private Property Rights Because the Condition Precedent to Their Rights to Allotments Never Occurred**

Article 3 of the 1866 Choctaw and Chickasaw Treaty provided that if the tribes adopted the Freedmen within two years, the tribes would receive a portion of a trust fund and the Freedmen members would be entitled to select 40-acre allotments once the Choctaw, Chickasaw, and Kansas Indians had selected their lands. 14 Stat. 770. The United States did not allot the Choctaw and Chickasaw land until the turn of the 20th century pursuant to an allotment agreement with the tribes. *See*, 30 Stat. 505; 32 Stat. 641.

Neither the Choctaw nor the Chickasaw Freedmen were entitled to receive their 40-acre allotments under the 1866 treaty because neither tribe adopted them within the two year window. The Choctaw adopted their Freedmen in 1883 and declared they were entitled to their allotments. But this was well beyond the period provided by the treaty. *Choctaw Nation*, 318 U.S. at 425. The Chickasaw Tribe never adopted their Freedmen. The Choctaw and Chickasaw Freedmen were never entitled to land under the 1866 treaty because the condition precedent to their receiving allotments – that the tribes adopt them within two years – never occurred. *See*, *Silicon Image v. Genesis Microchip*, 395 F.3d 1358, 1363 (Fed. Cir. 2005), *aff'd*, 176 Fed. Appx. 109 (2006). Thus, taking the allegations in the complaint as true as to the Choctaw and Chickasaw tribes, the plaintiffs fail to state a claim on which relief can be granted.

### D. The Turn of the Century Allotment Agreements Superceded the Terms of the Treaties

In *Choctaw Nation*, the Supreme Court held that the Choctaw and Chickasaw allotment agreements superseded the terms on which the tribes would provide allotments to the Freedmen. *Choctaw Nation*, 318 U.S. at 428. There the Chickasaw Nation sued the United States seeking compensation for providing Choctaw Freedmen allotments out of the tribes' common lands. Under the terms of the 1866 treaty, Freedmen allotments were to come from Chickasaw common lands. The Court held that the terms of the treaty had been superseded by the Atoka Agreement, and that the Atoka Agreement was superseded, to the extent its was inconsistent, by the 1902 agreement. The terms on which the tribes provided allotments, therefore depended on the terms of the allotment agreements, not the treaty.

Like the Choctaw and Chickasaw treaty, the Seminole and Creek treaties were superseded by the tribes' allotment agreements to the extent the agreement was inconsistent with them. 30 Stat. 569 (Seminole); 31 Stat. 872 (Creek). If the Freedmen received property rights

under the 1866 treaties, those rights necessarily were superseded by the property rights to allotments they received under the allotment agreements.

In summary, the Plaintiffs have not met and cannot meet their burden of establishing any set of facts, pursuant to the Seminole, Creek, and Choctaw, and Chickasaw treaties and the Cherokee agreement, that would entitle them to compensation for land under the treaties.

## IV. CLAIMS OF THE CHICKASAW FREEDMEN ARE BARRED BY THE DOCTRINE OF RES JUDICATA

As discussed in detail above, the 1902 agreement with the Choctaw and Chickasaw, 32 Stat. 641, superseded all parts of the 1866 Chickasaw and Choctaw Treaty. However, the Chickasaw Tribe did not consent to the 1902 agreement until the United States agreed, in the 1902 agreement, to address its contention that the Freedmen were not entitled to receive allotments under the 1866 treaty.[6] See *Choctaw Nation*, 318 U.S. at 426-427, 433. *Chickasaw Freedmen*, 193 U.S. at 126-127; 1902 Agreement, §§ ii, 36-40, 68. As part of the 1902 agreement, the Chickasaw Tribe and the United States agreed that the Court of Claims would resolve the dispute. *Choctaw Nation*, 318 U.S. at 428, 433; *Chickasaw Freedmen*, 193 U.S. at 115, 121-122. The court was to determine the Chickasaw Freedmens' entitlement, if any, to lands or other benefits under the 1866 Treaty or subsequent laws.

The court concluded that the Chickasaw Freedmen had no rights to allotments under either the 1866 treaty or any law, other than the 1902 agreement. Accordingly, the court ordered the government to remit $606,936.08 "in full satisfaction of all claims by the Choctaw and Chickasaw Nations against the United States or the said Freedmen on account of the taking of the said lands for allotment to said freedmen" (emphasis supplied). The Chickasaw Freedmen

---

[6] In contrast, the Choctaw Nation granted equal rights and privileges under tribal law to their Freedmen in 1883. *Choctaw Nation*, 318 U.S. at 425.

were allowed to keep the land that the government had allotted to them under the1902 agreement. See *Choctaw Nation*, 318 U.S. at 428; *Chickasaw Freedmen*, 193 U.S. at 122, 126. The Court of Claims decision at 38 Ct. Cl. 558-559 was appealed to the Supreme Court in *Chickasaw Freedmen* which affirmed the Court of Claims. *Id.*

On appeal, in 1904, the Supreme Court in *Chickasaw Freedmen* affirmed the Court of Claims, holding that the Chickasaw Freedmen had no right to land, money, or trust disbursements under the 1866 treaty. *Chickasaw Freedmen*, 193 U.S. at 122, 123; *see also*, *Choctaw Nation*, 318 U.S. at 426, 428. The doctrine of res judicata bars the proposed plaintiffs in the instant case from relitigating those same claims here. The proposed Chickasaw plaintiffs in this case are the same or in privity with those in *Chickasaw Freedmen* and *Choctaw Nation* and, clearly the United States was a party in each of these cases. Equally plain is the fact that the proposed plaintiff Freedmen derive their claim in this case from that of their alleged Chickasaw Freedmen ancestors. Compl. 2.

As a legal matter, the doctrine of res judicata bars plaintiffs' claims because (a) the parties in *Chickasaw Freedman* and *Choctaw Nation* are the same or in privity with those in this proceeding (*See Chickasaw Freedman* 193 U.S. 115, 121, 123, 127)[7/] and (b) plaintiffs here are asserting the same cause of action that was asserted in those cases. Then and now, the issue is the same: the extent to which, if at all, the Chickasaw Freedmen are entitled to land, monies, or

---

[7/] Plaintiffs here are in privity with their purported ancestors because they derive their claims from being part of the same class. *See In re: Crash at Dallas/Fort Worth*, 861 F.2d 814, 817 (5th Cir. 1988) (res judicata bars parent's subsequent action where daughter brought previous action in a representational capacity, previous action arose from the same nucleus of operative facts, and daughter could have raised the same claim in previous suit as the parents in the subsequent suit); *Bear v. United States*, 810 F.2d 153-154, 157 (8th Cir. 1987) (previous suit in which Indian tribe was a party against the United States bars subsequent suit against the government by individual descendants of tribal members); *Robertson v. United States*, 7 Cl. Ct. 155-156, 160 (1984) (Supreme Court's previous adjudication of entitlement of Cherokee Freedmen to certain monies bars subsequent suits by descendants of those Freedmen).

trust disbursements under the 1866 treaty and subsequent laws. See *Nevada v. United States*, 463 U.S. 110, 130-45 (1983); *Federated Department Stores v. Moitie*, 452 U.S. 394, 398 (1981); *Naylor v. United States*, 53 Fed. Cl. 172, 176 (2002) (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)) ("Res judicata has the 'dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation'").

As recently as 1991, this exact same claim, presented by a Chickasaw ancestor to Chickasaw Freedmen, was litigated in *Casey-El v. United States*. The Claims Court's dismissal of that case was affirmed by the Federal Circuit because "[t]he doctrine of res judicata bars Casey-El from relitigating these claims to land or money under the 1866 Treaty . . . Casey-El's ancestors were bound by the results of the Supreme Court case [in *Chickasaw Freedmen, supra.]*. Casey-El stands in the position of his ancestor. Therefore, the Claims Court properly dismissed Casey-El's claim." *Casey-El v. United States*, 951 F.2d 1267 (Fed. Cir. 1991) (unpublished opinion) .

As in the prior litigation, the claims presented here on behalf of proposed Chickasaw freemen are exactly the sort of duplicative litigation that the doctrine of res judicata seeks to prevent. Similar or identical claims should, therefore, be precluded and dismissed in this lawsuit.

## V. THIS COURT LACKS THE POWER TO GRANT THE EQUITABLE RELIEF SOUGHT BY PLAINTIFFS

Plaintiffs' Complaint requests declaratory, injunctive, and mandamus relief. *See* Compl. at 7-8. Plaintiffs cite to no authority that would allow the Court to grant such equitable relief, and, indeed, no such authority exists. In the absence of an express grant of jurisdiction from Congress, the Court of Federal Claims does not have the authority to issue declaratory or

injunctive relief. *White Buffalo Constr., Inc. v. United States*, 52 Fed. Cl. 1, 5 n. 9 (2002); *see also United States v. King*, 395 U.S. 1, 5 (1969) ("In the absence of an express grant of jurisdiction from Congress, we decline to assume that the Court of Claims has been given authority to issue declaratory judgments."); *Brown v. United States*, 105 F.3d 621, 624 (Fed. Cir. 1997) (demands for declaratory and injunctive relief are outside the Court of Federal Claims' jurisdiction). For example, Congress has specifically granted the Court of Federal Claims the power to grant both declaratory and injunctive relief in bid protest cases. See 28 U.S.C. § 1491(b)(2) (2001). Otherwise, where permitted by the Constitution or a federal statute(s), the Court of Federal Claims' jurisdiction is limited to the payment of money damages. *Murray v. United States*, 817 F.2d 1580, 1582-83 (Fed. Cir. 1987). Accordingly, the Court should dismiss Plaintiffs' claims for declaratory, injunctive, and mandamus relief.

## VI. THE HARVEST INSTITUTE AND BLACK INDIANS UNITED LEGAL DEFENSE AND EDUCATION FUND PLAINTIFFS HAVE FAILED TO ESTABLISH THEIR CONSTITUTIONAL STANDING TO ASSERT CLAIMS IN THIS CASE

The Harvest Institute and Black Indians United Legal Defense and Education Fund ("the entities") are identified as plaintiffs in the Complaint. Compl. 2, 4. Both entities allege having advocacy and education interests in common with "Black Indian Descendants". *Id.* Neither entity asserts that it has suffered an injury to a legally protected interest. Because the entities do not allege a property interest in the lawsuit that *they* own, the entities lack constitutional standing to assert any claim in this case against the United States.

"A fundamental jurisdictional consideration for any federal court, including Article I courts, is whether the plaintiff has constitutional standing." *Aldridge v. United States*, 59 Fed. Cl. 387, 388 (2004) (citing, *inter alia*, *Glass v. United States*, 258 F.3d 1349, 1355-56 (Fed. Cir. 2001)). "'Fundamentally,' the Federal Circuit has stated, 'the question of standing involves the

determination of whether a particular litigant is entitled to invoke the jurisdiction of a federal court to decide the merits of a dispute or of particular issues.'" *Emerald Int'l Corp. v. United States*, 54 Fed. Cl. 674, 677 (2002) (quoting *McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544, 1549 (Fed. Cir. 1986)). Furthermore, a federal court must resolve threshold jurisdictional issues before it addresses the underlying merits of a case, to ensure that the particular plaintiff has presented an actual case or controversy to the court. *See Entergy Nuclear Indian Point 2, LLC v. United States*, 64 Fed. Cl.515, 522 (2005) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998)).[8/]

To have constitutional standing, a litigant must demonstrate, first, that it has suffered an injury in fact, that is, "'an invasion of a legally protected interest'[9/] that is 'concrete and particularized,' and 'actual or imminent.'" *Aldridge*, 59 Fed. Cl. at 388 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The plaintiff must then establish a causal connection between the injury-in-fact and the challenged conduct. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Finally, the plaintiff must demonstrate that it is likely, and

---

[8/] The United States, as sovereign, is immune from suit unless it waives that immunity. *See Library of Congress v. Shaw*, 478 U.S. 310, 315 (1986). "The Tucker Act both confers jurisdiction upon the United States Court of Federal Claims and waives sovereign immunity [ ] for monetary relief brought against the United States." *Ruttenburg v. United States*, 65 Fed. Cl. 49-50 (2005) (citing *United States v. Mitchell*, 463 U.S. 206, 212-18 (1983)). Thus, although the Tucker Act provides jurisdiction in the Court of Federal Claims over claims "founded ... upon the Constitution" or "upon any express ... contract with the United States," the court must scrutinize the claim at issue to determine if the party asserting the claim, as well as the claim itself, falls within the scope of the Tucker Act's jurisdictional grant and waiver of sovereign immunity.

[9/] *E.g.*, in every Fifth Amendment takings case, each plaintiff must prove – as a threshold matter – that it had an ownership interest in the property allegedly taken on the date of the alleged taking. *See, e.g., United States v. Dow*, 357 U.S. 17, 20-21 (1958) (only the owner of the property at the time of the taking is entitled to compensation under the Fifth Amendment); *Applegate v. United States*, 35 Fed. Cl. 406, 421 (1996) (holding that the plaintiffs were precluded from recovering damages for any property taken before the date that they acquired each affected property). The Entities possess no property interest, or even a claim to a property interest in the instant case.

not merely speculative, that the injury will be redressed by a favorable decision. *Id.* The Complaint does not assert that these entities meet any of these threshold requirements to establish constitutional standing.

The Harvest Institute Freedman Federation and the Black Indians United Legal Defense and Educational Fund have no concrete claims of injury alleged against the United States that can be remedied in this action. No claim is asserted in this action that would entitle these two entities to monetary relief. The Complaint alleges that treaties and the Cherokee agreement were breached, but not that these entities were parties to the treaties or that they are in privity with purported Freedmen ancestors. In fact, contrary to any claims the entities themselves may have, the Complaint asserts that Freedmen Indians in their individual capacities are entitled to receive benefits under the treaties and for breach of fiduciary duties. Compl. generally. The Complaint describes the parties in interest as "descendants of former slaves" (*id.* at 2), that William Warrior is a descendant of such Black Indians and a representative of the entire class of such persons (*id.),* and that "[t]his action is being brought on behalf of the descendants of these Black Indians (*id.* at 7).

Nowhere does the Complaint claim that the entities are entitled to benefits under the treaties or agreement or that there are any statutes or regulations fairly interpreted that mandate any compensation owing to them for the breach of any statute or regulation. "Rule 17(a) does not give them standing; 'real party in interest' is very different from standing." *Kent v. N. Cal. Reg'l Office of the Am. Friends Serv. Comm*., 497 F.2d 1325, 1329 (9th Cir.1974) (holding that the trustees of a trust fund in which taxpayers' money was kept were the real-parties-in-interest with respect to the trust fund, but they did not have standing to sue the government to enjoin collection of taxes in the trust fund, because only the taxpayers themselves had standing); see

also 6 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 1542. Here, similarly, only individual descendants of Freemen, assuming the validity of the claims, would be entitled to a monetary remedy, and only those individuals would have standing to bring the lawsuit.

It appears undisputed, therefore, that the Harvest Institute or the Black Indians United Legal Defense and Educational Fund do not have any property interests that are the subject matter of this lawsuit and neither entity asserts such in the Complaint. *See, e.g., Dow*, 357 U.S. at 20.

Neither entity allege any injury-in-fact or satisfy the redressability elements to establish constitutional standing.[10/] Thus, these entities must be dismissed as parties from the lawsuit.

**Conclusion**

For the foregoing reasons defendant's motion to dismiss should be granted.

---

[10/] Prudential considerations also favor barring the Harvest Institute and the Black Indians United Legal Defense and Educational Fund's claims. "Standing reflects both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1290 (Fed. Cir. 1999) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "In addition to the limitations on standing imposed by Art. III's case or controversy requirement, there are prudential considerations that limit the challenges courts are willing to hear." *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984). A party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499 (citation omitted); *see also Munson*, 467 U.S. at 954. In making their claims, plaintiffs are required to assert their own rights; they are not permitted to stake their claim for relief on "the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. Accordingly, the Harvest Institute and the Black Indians United Legal Defense and Educational Fund should not be permitted to stake their claim for relief on the interests of the alleged Freedman ancestors.

Respectfully submitted,

MATTHEW J. MCKEOWN
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

/s/

Daniel G. Steele
Attorney of Record for Defendant
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington D.C., 20044-0663
Tel: (202) 305 - 0484
Facsimile: (202) 305-0267

Of Counsel:
Jane Smith, Esquire
Attorney-Advisor
Bureau of Indian Affairs
United States Department of the Interior
1849 C Street
Washington, D.C. 20240

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 4st day of April, 2007 the foregoing Defendants' Motion to Dismiss and accompanying Memorandum was filed with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the following:

Percy Squire, Esquire
Attorney for Plaintiffs
Percy Squire Co., L.L.D.
514 S. High Street
Columbus, OH 43215

/s/
Daniel G. Steele, Attorney