IN THE FEDERAL COURT OF CLAIMS

| | | |
|---|---|---|
| Harvest Institute Freedman Federation, *et al.* | : | |
| Plaintiffs, | : | Judge Robert Hodges |
| vs. | : | Case No.06-907L |
| Dirk Kempthorne, Department of the Interior, *et al* | : | |
| Defendants. | : | |

## AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Plaintiffs Harvest Institute Freedman Federation, William Warrior and Black Indians United Legal Defense and Educational Fund, bring this action based upon various treaties described in greater detail below against Defendants in their official capacities.

## I. INTRODUCTION: FACTS COMMON TO ALL COUNTS

1. This action is brought under the provisions of Title 28 United States Code Sections, 1491 and 1505, to compel the United States as trustee to perform duties owed to plaintiffs in their capacity as beneficiaries of certain Indian treaties and express agreements between the United States and various Indian tribes, described in greater detail below, and 28 U.S.C. §1507. Plaintiff, Harvest Institute Freedman Federation Institute (hereinafter the "Institute"), is an organization formed to pursue legal redress and to vindicate the civil and property rights of the descendants of former slaves of both African and Indian ancestry, held in bondage by Indian tribes located within the United States prior to 1866 commonly referred to as Freedman or in some instances Black Indians. The Institute is comprised of the individual Freedmen members of the so called Five Civilized Tribes, Seminole, Creek, Choctaw, Chickasaw and Cherokee. The

Institute's members, but for their lack of resources and in some instances education, otherwise have the requisite personal stake in the outcome of this action to sue in their own right, the interests the Institute seeks to protect are germane to its purpose and neither the claims asserted herein nor the relief requested requires the participation of individual Freedmen. Plaintiff William Warrior is a descendant of such Freedmen and a representative of the entire class of such persons, a class too numerous to list individually as plaintiffs in this action. Specifically, Plaintiff Warrior is a lineal descendant of Chief John Horse's Band of Ethnic Seminole Nation Citizens. Plaintiff Black Indian United Legal Defense and Education Fund (hereinafter the "Fund") is an organization formed to provide structural educational and policy guidance to the descendants of Freedmen concerning their status in relation to Native Americans, the States and the United States. Plaintiffs have suffered an injury that is concrete and particular, actual, directly traceable to the actions of defendants or their predecessors and capable of redress here by a favorable decision.

2. Defendant Kempthorne is the Secretary of the United States Department of the Interior, the federal agency with jurisdiction over the Bureau of Indian Affairs (BIA). BIA has responsibility for the administration and management of all land held in trust by the United States for American Indians, Indian tribes at Alaskan Nations. The position of Assistant Secretary of the Interior for Indian Affairs is vacant.

3. The defendants in this action owe a continuing duty to plaintiffs, each of which gives rise to a separate cause of action. Plaintiffs' claims are inherently susceptible to being broken down into a series of independent and distinct wrongs, each having its own associated damages. From the inception of the treaties sued upon here, on

a daily basis until the present defendants or their predecessors have committed separate breaches that individually give rise to damages. Accordingly, the claims asserted here are based on the continuing claims doctrine and the defendants owe continuing duties to plaintiffs which defendants have breached.

4. This action is to obtain relief by reason of Defendants failure to perform duties imposed upon them by certain treaties between the United States and Indian tribes not loyal to the United States during the War Between the States, the so-called Civil War, 1861-1865. These treaties required the disloyal Native American tribes to abolish slavery within their respective territories and to, *inter alia,* convey land to the United States for subsequent allocation to Freedmen or to allocate land within the respective tribes territory directly to Black Indians previously held in bondage by the disloyal tribes. Notwithstanding the clear and unambiguous undertaking by the United States of full fiduciary responsibility to cause land and benefits to go to Black Indians, the Department of Interior either never conveyed land to the Black Indians as expressly required by the relevant treaties and agreements, failed to cause the tribes to convey land, or in cases where conveyances and related benefits were awarded, failed to provide the requisite assistance and counsel to the beneficiaries to prevent their exploitation by persons desiring to misappropriate the land by insidious means, which resulted in widespread economic injury to Plaintiffs. In this action by reason of the indisputable fiduciary obligation of the highest order owed by the United States in dealings with the Freedmen, as noted in *Vann v. Kempthorne*, 467 F. Supp. 2d 56 (D.D.C. 2006), and the exacting standards which the United States is bound to observe when dealing with Freedmen, plaintiffs seek redress in the form of monetary and declaratory relief.

5. During the Civil War, the Five Civilized Tribes[1] entered into treaties with the Confederacy, severing their relations with the United States. In 1866, the United States made treaties with each of the Five Civilized Tribes, setting the terms on which the tribes would continue to exist within the United States. All of the treaties with the Five Civilized Tribes eradicated slavery within the tribes and provided that the emancipated "Freedmen" would have certain rights within the tribes. Although these Treaties had a common purpose, the provisions of the various Treaties were not identical. The following is a summary of the provisions of the treaties pertinent to this action.

6. **The Seminole Treaty:** The United States entered into its first antebellum treaty with the Seminole in 1866. 14 Stat. 755. The treaty provided that the Freedmen members would have rights equal to those of Seminoles by blood:

> And inasmuch as there are among the Seminoles many persons of African descent and blood, who have no interest or property in the soil, and no recognized civil rights, it is stipulated that hereafter these persons and their descendants, and such other of the same race as shall be permitted by said nation to settle there, shall have and enjoy all the rights of native citizens, and the laws of said nation shall be equally binding upon all persons of whatever race or color who may be adopted as citizens or members of said tribe.

14 Stat. 755, 756. In 1898, the Seminole entered into an agreement with the United States to allot its land held in common to individual members. 30 Stat. 567. The agreement made no distinction between the Freedmen members and the members by blood. All Freedmen members, those represented by the plaintiffs here, did not receive allotments under this agreement.

[1] The Seminole, Cherokee, Creek, Choctaw and Chickasaw tribes comprise of Five Civilized Tribes. Plaintiffs do not assert a claim under the 1866 Treaty with the Cherokee. *See* 14 Stat. 799.

7. **The Creek Treaty:** The United States' treaty with the Creek is similar to its treaty with the Seminole. It provided that the Creek Freedmen would have all the rights of members by blood, including the right to share equally in land and funds:

> [A]nd inasmuch as there are among the Creeks many persons of African descent, who have no interest in the soil, it is stipulated that hereafter those persons lawfully residing in said Creek country under their laws and usages…shall have and enjoy all the rights and privileges of native citizens, including an equal inters tint he soil and national funds, and the laws of said nation shall be equally binding upon and give equal protection to all such persons, and all others, of whatever race or color, who may be adopted as citizens or members of said tribe.

14 Stat. 785, 786. In 1897, the United States and the Creek Nation agreed to terms on which the Creek Nation's common lands would be allotted. 30 Stat. 496, 514. The agreement made no distinction between Creeks by blood and the Freedmen. In 1901, the Creek entered a second agreement with the United States. 31 Stat. 861. Like the first, this agreement made no distinction between Creek Indian and Freedmen members. The Creek Freedmen represented by Plaintiffs here did not receive their allotments on the same terms as the Creek members by blood.

8. **The Cherokee Agreement:** The United States entered into a treaty with the Cherokee in 1866. The treaty of 1866, *inter alia* is a basis for plaintiffs' claims here. A treaty with the Cherokee Tribe and the United States was concluded on July 19, 1866. Article IV of that Treaty provided that "…[a]ll of the Cherokee freed Negros who were formerly slaves to any Cherokee, and all free Negros not having been slaves, who resided in the Cherokee nation prior to June 1, 1861…shall have the right to settle in and occupy the Canadian district…and will include a quantity of land equal to 160 acres for each

person who may so elect to reside in the territory…" Thus, as in the case of the Choctaw and Chickasaw Freedmen, the Cherokee Freedmen were "adopted into the tribe [and] [c]onsequently, they and their descendants were entitled to participate in the allotment of lands equally with members of the tribe by blood." *Ross v. Ickes*, 130 F.2d 415 (D.C.C. 1942). It is in the failure of the Cherokee to allot land to the Freedmen represented by the Plaintiffs in this action that gives rise to this Complaint.

9. **The Choctaw and Chickasaw Treaty:** The United States entered into a treaty with the Choctaw and Chickasaw Tribes on April 28, 1866. 14 Stat. 769. This treaty provided that the tribes had a choice about how to deal with their Freedmen. If the tribes made their Freedmen members within two years, the tribes would receive a portion of a trust fund, and the Freedmen would receive 40-acre allotments once the Choctaw, Chickasaw and Kansas Indians had made their selections. If the tribes did not adopt their Freedmen and the Freedmen voluntarily removed themselves to other land within Indian Territory, the tribes would get nothing and the [Freedmen would receive a portion of the trust fund. *Id*] The Choctaw and Chickasaw resisted adopting the Freedmen, so the Freedmen were not entitled to the 40-acre allotments. In 1883, the Choctaw adopted the Freedmen into the tribe and declared each was entitled to 40 acres. The tribe made no allotments at that time either. *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 425 (1943). The Chickasaw never did adopt their Freedmen into the tribe.

10. In 1897, the United States entered into an agreement with the Choctaw and Chickasaw whereby their lands held in common would be allotted. 30 Stat. 496, 505-506. This agreement provided that the Choctaw Freedmen would receive 40-acre allotments. 30 Stat. 506. Before any allotments were made, the United States entered

into another agreement with the tribes. This second agreement also provided that Choctaw and Chickasaw Freedmen would receive 40 acres. 32 Stat. 641.

While the Choctaw and Chickasaw treaty provided conditional property rights, none of the other treaties entitled the Freedmen to individual property rights. The Freedmen represented by Plaintiffs here did not receive allotments under their tribes' allotment agreements with the United States at the turn of the 20th century.

11. The facts set forth above outline the background for plaintiffs' claims herein. By reason of their voluminous nature, the various treaties mentioned are not attached to this Complaint, however they are in the possession of defendants and their terms are known to defendants.

## II. JURISDICTION

12. Jurisdiction over this action arises under the provisions of 28 U.S.C. §1491(a) and 1505, the Tucker Act and the Indian Tucker Act. Plaintiffs' claims are cognizable in the Federal Court of Claims for the reason it is a clearly established principle that the beneficiary of a trust may maintain an action to compel the trustee to perform his duties. Here the United States clearly undertook and assumed responsibility as a trustee on behalf of Freedmen. Moreover, the injury complained of herein having accrued prior to August 13, 1946, by reason of the conduct and inaction of the defendants continues until this day. On a separate and discrete basis from day to day each failure constituting a violation and separate cause of action.

## III. PARTIES

13. Plaintiff Harvest Institute Freedman Federation is an unincorporated association formed for the specific purpose of seeking redress through the courts to

compel the United States to perform obligations owed under various treaties described above to Freedmen. The Institute has conducted research, provided financing and required legal resources, including counsel, to advocate on behalf of Freedmen. The Institute's membership is comprised of persons with African and Native American ancestry, each of whom has standing to sue their own right. The interests which the Institute seeks to protect are germane to its purpose and do not require the participation of individual Freedmen.

14. Plaintiff Fund, a separate nonprofit organization, is the legislative advocacy arm for Black Indian Descendants of the Five Civilized Tribes. The Fund's purpose is to engage in any lawful act or activity for which corporations may be organized under the general corporation law of Oklahoma. The Fund is focused on educating members, and the general public regarding the history, culture and political rights of those particular to the Dawes Enrollment. To promote, assist in collecting, and preserving Oklahoma Black Indian History and Artifacts, to promote the unique cultural diversity of Black Indian Descendants for the general benefit and good of individuals, collective Tribes, representative communities, in the States and Nations.

The Fund is incorporated as an advocacy organization with the mission of educating public officials about Black Indian Descendants Rights under the treaties of 1866 between the Five Civilized Tribes (Chickasaw, Choctaw, Creek, Seminole and Cherokee), Black Indian and their Descendants and the United States.

15. Plaintiff William Warrior is a descendant of Black Indians from the Five Civilized Tribes and a person of Native American ancestry. Mr. Warrior will serve as the representative of the class of such persons. Plaintiff is a direct descendant of Chief John

Horse's Band of Seminoles. This Band was promised land by the United States under treaties respecting an Oklahoma settlement known as "Wewoka." The Defendants breached their duty to convey land to Plaintiff Warrior's predecessors. This treatment by the United States of ethnic members of the Native American tribes was commonplace and resulting in widespread denial of real property and other valuable resources to Plaintiff Warrior's class. A motion setting forth the commonality, typicality, and numerosity aspects of the putative class here will be filed separately. The Plaintiffs here suffered injuries here that are concrete, particular, actual, traceable to defendants or their predecessors' conduct, and capable of redress by a favorable decision here.

16. Defendant Dirk Kempthorne is the United States Secretary of the Interior. The Department of the Interior is the federal agency with oversight of the Bureau of Indian Affairs and has the statutory duty to enforce, administer and assure compliance by the United States with the terms and obligations of Indian treaties. Defendant Kempthorne is sued in his official capacity only.

17. Defendant The Bureau of Indian Affairs (BIA) has responsibility for the administration and management of 55.7 million acres of land held in trust by the United States for American Indians, Indian tribes and Alaska Natives and to implement the terms of treaties between Native American tribes and the United States.

## IV. FIRST CLAIM FOR RELIEF – DECLARATORY JUDGMENT

18. Plaintiffs reallege that which has been stated in paragraphs 1 through 17 above as though fully stated herein.

19. During the conflict between the United States and the Confederate States the so-called "civil war," certain Native American tribes who held persons of African

ancestry in bondage, abrogated their allegiance to the United States and supported the Confederacy. Among others, the Creek Nation, Cherokee, Seminoles, Choctaw and Chickasaw Nations, all repudiated allegiance to the United States and supported the rebelling states.

20. The action of these Native American groups violated the terms of then existing treaties with the United States thereby causing these treaties to become voidable.

21. Following the cessation of the conflict between the States, the disloyal Native American tribes by reason of their sovereign status undertook to maintain involuntary servitude within their respective territorial domains, within the continental United States, notwithstanding the Thirteenth Amendment's abolition of involuntary servitude.

22. In order to reconcile the relationship between these disloyal tribes and the United States, a series of agreements were entered into between the United States and the affected tribes. It is these treaties that are the focus of this action and which Plaintiffs seek to enforce.

23. Under these agreements or treaties slavery was abolished in Indian Country. Moreover, land was transferred to the United States or was agreed to be set aside by the Indian tribes for the benefit of former Indian Country slaves, known as Freedmen or Black Indians, being liberated by the agreements.

24. Despite the undertakings to terminate slavery in Indian Country and to provide various benefits to the liberated persons of African ancestry in accordance with the various treaties discussed in Paragraphs 5 through 11 above which are specifically by reference incorporated herein, the treaties provided for conveyances of land to qualifying

Freedmen. By reason of failure to perform their fiduciary duty owed to the Freedmen, the United States did not cause the expressly agreed upon land conveyances to occur. These parcels of land were not conveyed as mandated under the relevant treaties.

25. This action is being brought on behalf of the descendants of these Freedmen, all persons of African and Native American ancestry, to vindicate their rights to conveyances of land and other benefits provided for under the aforementioned treaties.

26. In accordance with the provisions of 28 U.S.C. §1507 and R.F.C.R. 57, Plaintiffs seek a declaration concerning the rights and liabilities of the United States in relation to the Black Indians descendants bringing this action as to their entitlement to land allotments and related benefits under each of the treaties set forth above in Paragraphs 6, 7, 8 and 9 of the Complaint

## V. SECOND CLAIM FOR RELIEF - DAMAGES

27. Plaintiffs reassert that which has been stated in Paragraphs 1 through 26 above as though fully stated herein.

28. Plaintiffs are beneficiaries of the treaties discussed in Paragraphs 6-9 above.

29. Defendants are fiduciaries to Plaintiffs under the treaties discussed in Paragraphs 6-9 above.

30. Plaintiffs bring this action by reason of defendants failure to perform their duties under the aforementioned treaties. Defendants' failure constitutes a breach of the various treaties and has resulted in actual economic harm to Plaintiffs.

31. By reason of economic harm to Plaintiffs, Plaintiffs seek damages.

32. Plaintiffs seek damages in an amount equal to the value of the land and related benefits denied to Plaintiffs by defendants failure to perform their fiduciary duties

**WHEREFORE**, Plaintiffs request the following:

a. An order certifying a class as more fully specified in Plaintiffs' motion for class certification to be filed forthwith;

b. A declaratory judgment that determines the rights and liabilities of the parties in relation to the treaties in Paragraph 12 above;

c. Damages in an amount not less than $50,000,000.00 to be provided with greater particularity at trial;

d. Reasonable attorney fees; and

e. Such other relief, including interest and costs, as the Court deems just.

Respectfully submitted,

*s/Percy Squire, Esq.*
Percy Squire, Esq. (0022010)
Percy Squire Co., LLC
514 S. High Street
Columbus, OH 43215
614-224-6528 Telephone
614-224-6529 Facsimile
psquire@sp-lawfirm.com
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via U.S. Postal Service this 23rd day of July 2007, upon the following:

Jane Smith, Esq.
Attorney-Advisor
Bureau of Indian Affairs.
United States Department of the Interior
1849 C. Street
Washington, D.C. 20240

Daniel G. Steele
Attorney of Record for Defendant
Matthew J. McKeown
Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
PO Box 663
Washington, D.C. 20044-0663

*s/Percy Squire*
Percy Squire, Esq. (0022010)