**IN THE FEDERAL COURT OF CLAIMS**

| | | |
|---|---|---|
| Harvest Institute Freedman Federation, *et al.* | : | |
| Plaintiffs, | : | Judge Robert Hodges |
| vs. | : | Case No.06-907L |
| Dirk Kempthorne, Department of the Interior, *et al* | : | |
| Defendants. | : | |

**<u>SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS</u>**

This is to supplement Plaintiff's Memorandum in Opposition to the Motion of the United States to dismiss and to provide a bench memorandum to the Court in advance of the November 6, 2007 oral argument. The following statutes and treaties are relevant to the claims set forth within the Amended Complaint:

<u>Seminole Indians</u>:
Ratified Treaty, 14 Stat. 755 (March 21, 1868)
Ratified Agreement, 30 Stat. 567 (July 1, 1898)

<u>Creek Indians</u>:
Ratified Treaty, 14 Stat. 785 (June 14, 1866)
Ratified Agreement, 30 Stat. 495, 514 (June 28, 1898)
Ratified Agreement, 31 Stat. 861 (March 1, 1901)

<u>Cherokee Indians</u>:
Ratified Treaty, 14 Stat. 799 (July 19, 1866)

<u>Choctaw & Chickasaw Indians</u>:
Ratified Treaty, 14 Stat. 769 (April 28, 1866)
Ratified Agreement, 30 Stat. 495, 505 (June 26, 1898)
Ratified Agreement, 32 Stat. 641 (July 1, 1902)

<u>Seminole Indians</u>:
Ratified Agreement, 31 Stat. 250 (June 2, 1900)

Creek Indians:
Ratified Agreement, 32 Stat. 500 (June 30, 1902)

Cherokee Indians:
Ratified Agreement, 31 Stat. 848 (March 1, 1901)
Ratified Agreement, 32 Stat. 716 (July 1, 1902)

There are two denominated claims. The first seeks a declaration of the "rights and liabilities of the United States in relation to the Black Indians descendants bringing this action as to their entitlement to land allotments and related benefits under each of the treaties set forth above in Paragraphs 6, 7, 8 and 9 of the Complaint." (Am. Compl. ¶ 26.)

Second, the Amended Complaint includes a damages claim for Defendants' "failure to perform their duties under the aforementioned treaties" that give rise to "fiduciary" duties on the part of the Defendants. (Am. Compl. ¶¶ 29, 30.) This claim speaks in terms of "breach of the various treaties" and the Defendants' "failure to perform their fiduciary duties." (Am. Compl. ¶ 32.) Plaintiffs seek damages "in an amount equal to the value of the land and related benefits denied to Plaintiffs." (Am. Compl. ¶ 32.)

The Amended Complaint alleges "a continuing duty to plaintiffs, each of which gives rise to a separate cause of action" and that there have been "separate" and "daily" breaches of the duty since the "inception of the treaties sued upon." (Am. Compl. ¶ 3.) The Amended Complaint generally alleges that the "treaties" obligated the Five Civilized Tribes[1] to either "convey land to the United States for subsequent allocation to Freedmen" or to "allocate land within the respective tribe's territory directly to Black

---

[1] The Creek, Choctaw, Chickasaw, Cherokee, and Seminole.

Indians previously held in bondage by the disloyal tribes." (Am. Compl. ¶ 4.) The Amended Complaint describes the government's duty as a "full fiduciary responsibility to cause land and benefits to go to Black Indians." (Am. Compl. ¶ 4.)

The government breached that duty because it: (a) "never conveyed land to the Black Indians as expressly required by the relevant treaties and agreements"; (b) "failed to cause the tribes to convey land"; or (c) "in cases where conveyances and related benefits were awarded, failed to provide the requisite assistance and counsel to the beneficiaries to prevent their exploitation by persons desiring to misappropriate the land by insidious means, which resulted in widespread economic injury to Plaintiffs." (Am. Compl. ¶ 4.)

## I. The Government's Statute of Limitations Argument

The government argues the claims are barred by the six-year statute of limitations, 28 U.S.C. 2501. (Motion to Dismiss at 7-10.) It provides:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

This statute is jurisdictional, and equitable doctrines like waiver or estoppel will not prevent it from applying. *Wolfchild v. United States*, 62 Fed. Cl. 521, 547 (2004). However, the statute is not a bar under the continuing claims doctrine

In its brief, the government argues that the claims "first" accrued "at the latest, at the turn of the century when the parties agreed to supercede those treaties and agreement [sic] to the extent they were inconsistent with the allotment agreements." (Motion to

Dismiss at 9.) It says that "[a]ll of the allotment agreements contained provisions that superseded inconsistent provisions of the 1866 treaties." (Motion to Dismiss at 9.) "If the Freedmen received rights to enjoy the tribes' common land under the 1866 treaties, the property rights to allotments received under the allotment agreements necessarily superseded those rights by providing allotments." (Motion to Dismiss at 9.) "Applying statute of limitations principles, Congress's ratifying and executing the allotment agreements was the last event that occurred that fixed the Government's purported liability under the treaties." (Motion to Dismiss at 10.)

The government argues in its Reply that after Plaintiffs filed the Amended Complaint, the "[a]ssertion of a continuing claim from the time the events complained of accrued, at the latest by the turn-of-the-century, to within six years of the lawsuit does not resurrect these long-expired claims." (Reply at 3.) The government argues that Plaintiffs first had to establish the source of a duty on the part of the government that can be interpreted as mandating compensation by the government (i.e. a "money-mandating obligation") that is rooted in "a statute, treaty, or regulation that imposes a specific fiduciary duty on the United States." (Reply at 4.) It suggests that Plaintiffs had failed to do this and, as a result, cannot even begin to establish when their claims "first" accrued.

The government then argues that the event of which the Plaintiffs complain was a singular, discrete, or unitary event—the failure to convey land allotments shortly after the 1866 treaties. (Reply at 5-6.) It explains: "At bottom, the alleged duty, by its nature, is not a recurring duty. The act of allotting Freedmen lands are acts that either did or did not occur, but they are not recurring events." (Reply at 7.) It further characterizes the government's action or inaction as a "one-time" event that "occurred, if at all, at one

point in time well beyond the statute of limitations period and did not constitute multiple events." (Reply at 8, 10.)

Finally, the government argues that the allotment acts at the turn of the century "were intended by Congress to supercede the earlier treaties" and therefore any claims that the government breached its duties under the earlier treaties had to be brought within six years of the allotment acts that superseded those treaties. (Reply at 11.) The government further suggests that "to the extent the Freedmen were entitled to receive land, these [allotment] agreements fulfilled that entitlement" and therefore "the treaties upon which the Plaintiffs rely in this suit do not and cannot give rise to the cause of action they allege." (Reply at 11.)

For reasons set forth below, these arguments should be rejected.

## II. The Continuing Claims Doctrine

### A. Generally

The Court of Appeals for the Federal Circuit recently explained the continuing claims doctrine as follows:

> [T]he continuing claim doctrine is applicable where "each wrong constituted an alleged violation of a statute or regulation that occurred when that particular wrong occurred, independent of the accrual of other wrongs."
>
> * * *
>
> On the other hand, if there was only a single alleged wrong, even though the wrong caused later adverse effects, our

> case law has said the continuing claim doctrine is not applicable.

*Wells v. United States*, 420 F.3d 1343 (Fed. Cir. 2004) (holding plaintiff could apply the Doctrine to claims against the government for deducting too much from his Navy retirement pay contrary to 5 U.S.C. 5514(a)(1)).[2] "Therefore, a continuing claim exists in cases where the defendant owes the plaintiff an ever-present duty, the nonperformance of which would give rise to a series of actionable breaches, but the doctrine will not apply if the plaintiff's claim arises from a 'seminal event' that would constitute one cause of action for the purposes of the statute of limitations." *Central Pines Land Co. v. United States*, 61 Fed. Cl. 527, 537 (2004). The Doctrine does not allow plaintiffs to sue on claims that accrued more than six years prior to the lawsuit. Rather, it prevents the defendant from escaping all liability (and thereby "acquire a right" to continue its wrongdoing), while preserving the purpose of the six-year limitations period. *Mitchell v. United States*, 10 Cl. Ct. 63, 75 (1986). The Court of Claims has recognized that "the test for distinguishing continuing claims from single-event claims may not admit of easy or consistent application." *Baka v. United States*, 74 Fed. Cl. 692, 696 (2006).

The continuing claims doctrine has its roots in early "pay" cases. Those cases held that it applies when "there is no condition precedent to the accrual of the cause of action (such as a factual determination by an executive tribunal or the exhaustion of some special procedure or remedy)." *Friedman v. United States*, 159 Ct. Cl. 1, 8, 310 F.2d 381 (1962). The *Friedman* court explained:

---

[2] *See also Boling v. United States*, 220 F.3d 1365, 1373 (Fed. Cir. 2000) ("The continuing claims doctrine has been applied when the government owes a continuing duty to the plaintiffs. In such cases, each time the government breaches that duty, a new cause of action arises. ").

> The important characteristics of all these ["continuing claim" pay] cases were: (a) Congress had not entrusted an administrative officer or tribunal with the *determination* of the claimant's eligibility for the particular pay he sought; (b) the cases turned on pure issues of law or on specific issues of fact which the court was to decide for itself (*i.e.*, Congress had not established any administrative tribunal to *decide* either the factual or the legal questions); and (c) in general the cases called upon the court to resolve sharp and narrow factual issues not demanding judicial evaluation of broad concepts such as "disability" (concepts which involve the weighing of numerous factors and considerations as well as the exercise of expertise and discretion).

*Id*. at 7 (emphasis in original).

In *Friedman*, the Court of Claims declined to apply the doctrine in a pay case in order to allow a widow to sue for disability payments denied to her late husband within the six-year statute of limitations period. 159 Ct. Cl. at 6. The plaintiff's husband was a medical officer in the Army until 1947. After he left the Army, he made no attempt to seek disability pay from the Army. He died in 1958. In 1960, his widow applied for a determination that he was entitled to disability retirement pay between 1947 and 1958, which application was denied, and the widow sued. The Court held that the husband had been afforded a Retiring Board hearing at the end of his service, which was a final administrative action that triggered the running of the statute of limitations. *Id*. at 36-37. As a result, the continuing claims doctrine did not apply and the widow's claims were time-barred. *Id*. at 37.

In 2000, the Court of Appeals for the Federal Circuit, sitting *en banc*, reaffirmed and approved this three-part analysis. *Hatter v. United States*, 203 F.3d 795, 800 (Fed.

Cir. 2000), *rev'd in part on other grounds* 532 U.S. 557, 121 S. Ct. 1782, 149 L. Ed. 2d 820. The *Hatter* court explained:

> We find the analysis provided by Judge Davis in the *Friedman* opinion to be a useful and effective mechanism for distinguishing between cases when the Government has failed to make a series of payments claimed to be due (or, as here, has deducted or withheld pay), and the question is whether there is a seminal event that constitutes one cause of action, or whether each wrongful deduction or refusal to pay constitutes a separate cause of action. Statements such as "all necessary events had occurred," or "the claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs," may be accurate ways of describing the events after-the-fact, but they do not contribute to the analysis. The Government's reliance on such statements, rather than focusing on the *Friedman* factors, leaves us unpersuaded that the Government's view should prevail. We conclude that, for the reasons stated above, the case before us falls comfortably on the side of the line governed by the continuing claim doctrine.

*Id.*

The *Friedman* and *Hatter* cases were "pay" cases, and the utility and application of the three-part test to our case is applicable, since the claims here are not only a dispute over land allotments[3] but a claim for monetary benefits that were due. This action is premised on a theory of ongoing duty prescribed by treaty and statutes or ratified agreements. The Claims Court applied the continuing claims doctrine outside the context of pay cases in *Mitchell v. United States*, 10 Cl. Ct. 63 (1986), *modified in part* in

[3] The Amended Complaint also refers to and seeks damages for "other related benefits." Such benefits are similar to the payments claimed in the *Friedman* or *Hatter* cases.

*Mitchell v. United States*, 10 Cl. Ct. 787 (1986), without reference to the three-part test.[4] Mitchell controls on the facts alleged here.

### B. The *Mitchell* Case

The *Mitchell* case deserves separate discussion for the reason it involved claims for breach of fiduciary duty stemming from government inaction, to which the court applied the continuing claims doctrine.

In the *Mitchell* cases, the plaintiff allottees sued the government for breach of fiduciary duty for alleged mismanagement of timber resources. 10 Ct. Cl. at 65. The plaintiffs asserted a "stumpage claim," which alleged that the Secretary of Interior, although obliged to do so, failed to obtain fair market value for timber that was cut and sold since 1920. *Id.* at 66. The also asserted a "regeneration claim," which alleged that the Secretary breached his management duty by failing to introduce artificial regeneration practices on cut-over land according to sound forestry practices, resulting in inadequately restocked land. *Id.* Applying the continuing claims doctrine, the court explained:

> We begin with the premise that the statute was not tolled with respect to any claims; hence, any causes of action accruing prior to 1965 are time-barred. As indicated earlier, however, we do not view plaintiffs' claims as arising once and only once, resulting in a total elimination of their

[4] Note, however, that the Court of Appeals for the Federal Circuit has indicated that the three-part test may nevertheless still apply even where the claims is not a pay case and is based on an allegation that the Government had a continuing statutory duty that it breached by failing to take action. *Brown-Park Estates-Fairfield Development Company v. United States*, 127 F.3d 1449, 1459 n.13 (Fed. Cir. 1997) (explaining that since it determined that the appellants had not successfully asserted a continuing claim, "we do not need to address whether appellants would have met the *Friedman* conditions for applying the continuing claim doctrine").

> opportunity for recovery here. Rather, as discussed below, we consider plaintiffs' causes of action to be a series of individual claims, those of which accrued after 1965 being timely.
>
> Plaintiffs' stumpage claims stem from their allegations that the BIA sold their timber at inadequate prices. In the court's view, each such sale of a portion of timber generated a new and separate cause of action. Hence, plaintiffs may attempt to recover damages resulting from any timber sales in the six-year period before the filing of suit.
>
> Plaintiffs' regeneration claims ensue from their allegations that the BIA failed to artificially restock those portions of the allotments which had been cut or burned over. This failure to replant, contend plaintiffs, breached the BIA's duty to ensure adequate regeneration in those instances in which accepted forestry practice would have required artificial restocking. Moreover, plaintiffs have asserted that accepted forestry practice after 1957 was to artificially restock, which suggests that a duty to replant necessarily arose after every cutting since then.
>
> As with the stumpage claim, the court views each such harvesting of trees as generating a new cause of action. A duty to replant each stand arguably arose after its harvest and each failure to fulfill that duty gave rise to a separate claim. Moreover, that duty was a continuing one, and any ongoing failure to fulfill the duty gave rise to an ongoing series of individual claims as to each harvested stand. Thus, in the present case plaintiffs may seek recovery with respect to those stands on which a duty to replant existed after October 18, 1965, regardless of when the BIA last harvested the stand. Plaintiffs may recover, however, for only those breaches occurring between October 18, 1965 and the filing of suit.

*Id.* at 77 (as modified by 10 Cl. Ct. 787).

In another recent case, the Court of Federal Claims applied the continuing claims doctrine to claims brought by an irrigation district that alleged it was due a credit for paying in excess of actual power charges on an annual basis by the government. *Dalles*

*Irrigation District v. United States*, 71 Fed. Cl. 344 (2006). The district entered into a contract with the Department of Interior for hydroelectric power to be used for irrigation pumping in Oregon. *Id.* at 345. The district filed a complaint in 2004, claiming that the government had overcharged the district for energy since 1988. *Id.* The government argued the claims were time-barred. *Id.* The Court of Federal Claims rejected that argument, noting that the district was seeking only damages for the government's breach of contract since 1998. *Id.* at 351-55. The Court concluded that the parties' contract obligated the government to provide an annual estimate of energy costs, which was sufficient to invoke the continuing claims doctrine. *Id.* at 351-52. The government argued that the entire claim, however, was based on a single distinct event: the approval and implementation in 1990 of a formula by which all charges since that time have been calculated. *Id.* at 352. The Court rejected this as well: "The government's assertion, however, does not acknowledge the annual obligations the contract imposed on the government. Thus, accepting as true all facts asserted by the [district], the alleged failure by the government to satisfy its annual contractual duties resulted in a distinct claim every year." *Id.*

The Court of Appeals held that all of the fiduciary-breach claims were time-barred. *Id.* at 1582. However, with respect to the third claim, the Court of Appeals explained:

> While the wrong common to all of the Band's claims in this case was the unlawful termination of the Band's federal status, it would appear incorrect to conclude that all claims resulting from the termination of the Band as a tribe, including the termination itself, would be unreviewable unless challenged within 6 years of the termination date. Although we concluded in the preceding discussion that the

> Band's claims with respect to Parcel 1 were barred by operation of the jurisdictional limitation set forth in section 2501, for present purposes, we assume that the unlawful termination of the Band's status could result in injuries which fall within the "continuing claim" doctrine, sufficient to remove claims for the resulting damages occurring within 6 years of the complaint from the bar of section 2501.
>
> . . . Assuming, without so deciding, that the statutory source of benefits identified by the Band, the Indian Self-Determination and Education Assistance Act, §§ 104, 25 U.S.C. §§ 450f, g, h (1982), would mandate the payment of money to eligible Indian Tribes if arbitrarily denied, the denial of benefits to the Band resulting from the improper termination of the Band's federal status as eligible Indians could result in damages which would periodically accrue for as long as the tribe's status remained unlawfully terminated.
>
> Thus, if the "continuing claim" doctrine were deemed applicable to the present facts, the Band's suit could be maintained as to those denied statutory benefits which the Band could have applied for within 6 years of the filing of its complaint of September 1986. However, the "continuing claim" doctrine could only have had possible application as long as the underlying wrong remained uncorrected. Here, the underlying wrong, the unlawful termination of the Band's tribal status, was corrected when the United States government resumed recognition of a government-to-government relationship with the Hopland Band in April 1980. At that time, the Band regained its eligibility for federal programs administered by the Bureau of Indian Affairs such as the Indian Self-Determination and Education Assistance Act. Therefore, April 1986 was necessarily the latest that a claim seeking recovery for any of the benefits that were wrongfully withheld by the government on the basis of the unlawful termination which ended in April 1980 could have been filed without being foreclosed by section 2501. Since the present complaint was filed on September 3, 1986, it was untimely.

## III. The Importance and Source of Duty

Duty is essential for two reasons: (1) it must be specific and found in the prescriptions of treaties, statutes, or regulations in order to establish subject matter jurisdiction, and (2) the nature of the duty drives the application of the continuing claims doctrine within the statute of limitations analysis. While the Amended Complaint alleges a breach of duty, Plaintiffs will require discovery in order to identify the specific treaty, statutory, and regulatory obligation that have been breached.

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212, 103 S. Ct. 2961, 77 L. Ed. 2d 580 (1983) (hereinafter, "*Mitchell II*"). The Tucker Act (28 U.S.C. 1491) and the Indian Tucker Act (28 U.S.C. 1505) give jurisdiction to the Court of Federal Claims and constitute a waiver of sovereign immunity with respect to the claims referred to in the statutes. The Indian Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

28 U.S.C. 1505. The last clause of the Indian Tucker Act, referring to claims that are "otherwise cognizable in the Court of Federal Claims," incorporates the Tucker Act. *United States v. Navajo Nation*, 537 U.S. 488, 503 n.10, 123 S. Ct. 1079, 155 L. Ed. 2d 60 (2003). The Tucker Act provides in pertinent part:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. 1491(a)(1).

Although the Tucker Act and Indian Tucker Act confer jurisdiction by waiving sovereign immunity, they are not the source of substantive rights. *Navajo Nation*, 537 U.S. at 503. To state a claim, a plaintiff must "invoke a rights-creating source of substantive law that 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'" *Id.* It is not enough to rely on the general trust relationship between the Native Americans and the government.[5] *Id.* at 506. The Supreme Court explains:

> To state a claim cognizable under the Indian Tucker Act, *Mitchell I* and *Mitchell II* thus instruct, a Tribe must identify a substantive source of law that establishes **specific** fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties. If that threshold is passed, the court must then determine whether the relevant source of substantive law "can fairly be interpreted as mandating compensation for damages

[5] "The general relationship between the United States and the Indian tribes is not comparable to a private trust relationship. 'When the source of substantive law intended and recognized only the general, or bare, trust relationship, fiduciary obligations applicable to private trustees are not imposed on the United States.' Rather, the general relationship between Indian tribes and defendant traditionally has been understood to be in the nature of a guardian-ward relationship. 'A guardianship is not a trust.' 'The duties of a trustee are more intensive than the duties of some other fiduciaries.' Furthermore, a guardian-ward relationship implies that, at some point, the ward will begin to take responsibility for handling its own affairs. By contrast, a private trust relationship is a static relationship, with all encompassing duties forever on the trustee." *Cherokee Nation of Oklahoma v. United States*, 21 Cl. Ct. 565, 573 (1990) (citations omitted).

> sustained as a result of a breach of the duties [the governing law] imposes." **Although "the undisputed existence of a general trust relationship between the United States and the Indian people" can "reinforce" the conclusion that the relevant statute or regulation imposes fiduciary duties, that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act.** Instead, the analysis must train on **specific** rights-creating or duty-imposing statutory or regulatory **prescriptions**. Those prescriptions need not, however, expressly provide for money damages; the availability of such damages may be inferred.

(Emphasis added.) *Id.*; *see also Mitchell II*, 463 U.S. at 216-17 ("A substantive right must be found in some other source of law, such as 'the Constitution, or any Act of Congress, or any regulation of an executive department.' Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States, and the claimant must demonstrate that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'").

The *Mitchell* cases involved Indian land allottees' claims against the government to recover money damages for breaches of fiduciary duty when the government allegedly mismanaged timber resources on the allotted lands. In *Mitchell I*, the Supreme Court held that the "General Allotment Act of 1887" could not be read "as establishing that the Government has a fiduciary responsibility for management of allotted forest lands." *United States v. Mitchell*, 445 U.S. 535, 546, 100 S. Ct. 1349, 63 L. Ed. 2d 607 (1980) (hereinafter, "*Mitchell I*"). Section 1 of the Act authorized the President to allot certain acreage to each Indian on a reservation. *Id.* at 540. Section 5 provided that the United States retained title to the allotted lands in trust for the allottees' benefit:

> Upon approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefore in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made … and that at the expiration of said period the United States will convey the same by patent to said Indian … , in fee, discharged of said trust and free of all charge or incumbrance whatsoever: *Provided*, That the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void.

*Id.* at 541. The Supreme Court rejected the argument that this provision imposed "full fiduciary responsibilities as to the management of allotted lands." *Id.* at 542. Instead, the Supreme Court held that the General Allotment Act only imposed a "limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources." *Id.* It explained that the language of the Act and its legislative history "plainly indicates that the trust Congress placed on allotted lands is of limited scope" and that "Congress intended that, even during the period in which title to allotted land would remain in the United States, the allottee would occupy the land as a homestead for his personal use in agriculture or grazing" and, therefore, "[u]nder this scheme, then, the allottee, and not the United States, was to manage the land." *Id.* at 543. **However**, the Supreme Court left open the possibility that the Native Americans could establish that "other statutes" may be a source of duty that may render the government liable in money damages for the mismanagement, and remanded the case. *Id.* at 546 n.7.

The Supreme Court heard the case again three years later in *Mitchell II*. 463 U.S. 206. This time, the Court held that the trial court had jurisdiction because the fiduciary claims were based on duties found in other statutes and regulations. *Id*. at 228. Although the General Allotment Act was not the source of actionable fiduciary obligations (see *Mitchell I*), the Court concluded that the other "statutes and regulations at issue here can fairly be interpreted as mandating compensation by the Federal Government for violations of its fiduciary responsibilities in the management of Indian Property." Distinguishing the holding in *Mitchell I*, the Court explained:

> In contrast to the bare trust created by the General Allotment Act, the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities.

*Id*. at 224. The Court said there was a "pattern of pervasive federal control evident in the area of timber sales and timber management" and that the government had assumed "elaborate control over forests and property belonging to Indians." *Id*. at 225. It further stated that its "construction of these statutes and regulations is reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people."[6] *Id*. Finally, the Court reasoned that "[g]iven the existence of a trust relationship, it naturally follows that the government should be liable in damages for

---

[6] "This Court has previously emphasized 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.' This principle has long dominated the Government's dealings with Indians." *Mitchell II*, 463 U.S. at 225.

breach of its fiduciary duties" because "[i]t is well established that a trustee is accountable in damages for breaches of trust." *Id.* at 226.

In 2003, the Supreme Court reapplied the *Mitchell* framework in *Navajo Nation.* 537 U.S. 488. In *Navajo Nation*, the Court held that the Plaintiffs had failed to establish a sufficient duty to invoke the trial court's jurisdiction. *Id.* at 514. The Navajo sued the Secretary of Interior for alleged breach of fiduciary duty in connection with the Secretary's approval of coal lease amendments negotiated by the Tribe and a third-party, Peabody Coal Company ("Peabody"). *Id.* at 493. The Indian Mineral Leasing Act of 1938 ("IMLA") provides that unallotted lands in an Indian reservation can be leased for mining purposes by authority of the tribal council, subject to approval of the Secretary. *Id.* The Secretary approved a coal lease with Peabody in 1964 that had a maximum royalty rate of 37.5 cents/ton of coal. *Id.* at 495. The lease included a provision that made the rate subject to reasonable adjustment by the Secretary or his authorized representative on the lease's 20-year anniversary. *Id.* As of that anniversary, the royalty rate yielded only about 2% of gross proceeds for the Tribe, and was substantially lower than the 12.5% of gross proceeds rate that Congress had established in 1977 as the minimum permissible royalty for coal mined on federal lands under the Mineral Leasing Act. *Id.* at 496.

In 1984, the Tribe asked the Secretary to exercise his contractual authority to adjust the royalty rate. *Id.* The Director of the Bureau of Indian Affairs, acting by authority of the Secretary, wrote Peabody an opinion letter advising that the rate should be raised to 20% of gross proceeds. *Id.* Peabody contested, and filed an administrative appeal. *Id.* During the course of the appeal, and at a time when both sides believed a

decision favorable to the Tribe was imminent, Peabody contacted the Secretary and got him to send the officer hearing the appeal to tell the parties that a decision was not, in fact, imminent, and that they should continue their efforts to try and settle, so as to avoid costly further appeals. *Id.* at 497. Having heard that "someone" in Washington was urging a return to the bargaining table, and facing severe economic pressure, the Tribe resumed negotiations and reached a tentative agreement that provided a 12.5% royalty rate. *Id.* The Secretary approved the agreement in December 1987. *Id.* at 500.

In 1993, the Tribe sued the government, alleging that the Secretary's approval of the agreement constituted a breach of trust, and sought $600 million in damages. *Id.* The government won summary judgment, finding that although the Secretary "flagrantly" acted in the best interests of Peabody and not the Tribe, the Tribe nevertheless "failed to link that breach of duty to any statutory or regulatory obligation which could 'be fairly interpreted as mandating compensation for the government's fiduciary wrongs.'" *Id.* at 501. The Court of Appeals reversed, finding that the measure of control that the Secretary had over the leasing of Indian lands for mineral development sufficed to warrant a money judgment against the United States for breaches of fiduciary duties, relying in part on 25 U.S.C. 399 and regulations promulgated under that statute. *Id.*

The Supreme Court reversed. *Id.* at 502. The Court systematically rejected the Tribe's argument that the IMLA's statutory and regulatory scheme attached fiduciary duties to each government function under that scheme. *Id.* at 506-07. It explained:

> The IMLA and its implementing regulations impose no obligations resembling the detailed fiduciary responsibilities that *Mitchell II* found adequate to support a claim for money damages. The IMLA simply requires

> Secretarial approval before coal mining leases negotiated between Tribes and third parties become effective, 25 U.S.C. § 396a, and authorized the Secretary generally to promulgate regulations governing mining operations, § 396d. Yet the dissent concludes that the IMLA imposes "one or more specific statutory obligations, as in *Mitchell II*, at the level of fiduciary duty whose breach is compensable in damages." The endeavor to align this case with *Mitchell II* rather than *Mitchell I*, however valiant, falls short of the mark. Unlike the "elaborate" provisions before the Court in *Mitchell II*, the IMLA and its regulations do not "give the Federal Government full responsibility to manage Indian resources … for the benefit of the Indians[.]" The Secretary is neither assigned a comprehensive managerial role nor, at the time relevant here, expressly invested with responsibility to secure "the needs and best interests of the Indian owner and his heirs."
>
> Instead, the Secretary's involvement in coal leasing under the IMLA more closely resembles the role provided for the Government by the GAA regarding allotted forest lands [in *Mitchell I*]. Although the GAA required the Government to hold allotted land "in trust for the sole use and benefit of the Indian to whom such allotment shall have been made," that Act did not "authorize, much less require, the Government to manage timber resources for the benefit of Indian allottees[.] Similarly here, the IMLA and its regulations do not assign to the Secretary managerial control over coal leasing. Nor do they even establish the "limited trust relationship" existing under the GAA; no provision of the IMLA or its regulations contains *any* trust language with respect to coal leasing.

*Id.* at 507-08 (citations omitted) (emphasis in original). The Court also systematically rejected the Tribe's reliance on other statutes and regulations, which the Court determined were inapplicable or contrary to the IMLA. *Id.* at 508-13.

The *Mitchell* cases and the *Navajo Nation* case emphasize the need to identify the alleged duties and root them in specific language from relevant treaties, statutes, or regulations. Here in advance of any ruling or the statute of limitations defense, Plaintiffs must be permitted discovery in order to point out these specific roots.

## V. Repudiation Rule

Aside form the continuing claims doctrine, there is a general "repudiation rule" with regards to equitable trusts that says the statute of limitations will not begin to run on claims to enforce a trust against a trustee until repudiation of the trust relationship. See , 54, A.L. R.2d 13. The underlying rationale is that the trustee's possession of trust assets is presumed to be possession for the beneficiary (i.e. the cestui que trust), and the time should begin to run on claims against the trustee only when the trustee has taken some acts or communicated in a way that is inconsistent with that presumption, so as to provide notice that the trustee has disavowed the trust relationship or is no longer acting in the interests of the beneficiary. The repudiation rule is applicable to the extent that the Freedmen are seeking recovery of trust property itself, which is the case here.

The repudiation rule has appeared in cases involving Native American trust claims.

The repudiation rule may be applied to claims that seek recovery of the assets themselves, such as land and monetary benefits. Here, the Freedmen are seeking to recover trust property currently held by the Government, their claims to that property is preserved by the repudiation doctrine. The Government has not expressly repudiated its trust relationship with the Freedmen, thus the statute of limitations has not run.

## VI. Conclusion

There is a unique and long history of general fiduciary obligations between the government and Native Americans. For example, the Supreme Court has explained:

> Furthermore, this Court has recognized the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited

> people. E.g., *Cherokee Nation* v. *Georgia*, 5 Pet. 1; *United States* v. *Kagama*, 118 U.S. 375; *Choctaw Nation* v. *United States*, 119 U.S. 1; *United States* v. *Pelican*, 232 U.S. 442; *United States* v. *Creek Nation*, 295 U.S. 103; *Tulee* v. *Washington*, 315 U.S. 681. In carrying out its treaty obligations with the Indian tribes, the Government is something more than a mere contracting party. Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, it has charged itself with ***moral obligations of the highest responsibility and trust***. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the ***most exacting fiduciary standards***. Payment of funds at the request of a tribal council which, to the knowledge of the Government officers charged with the administration of Indian affairs and the disbursement of funds to satisfy treaty obligations, was composed of representatives faithless to their own people and without integrity would be a clear breach of the Government's fiduciary obligation.

*Seminole Nation v. United States*, 316 U.S. 286, 296-97, 62 S. Ct. 1049, 86 L. Ed. 1480 (1942) (footnote omitted) (emphasis added). *See also Mitchell II*, 463 U.S. at 225 ("This principle has long dominated the Government's dealings with Indians.").

The Freedmen are unique from other Native Americans because of the additional injustice and oppression they suffered because they are also African American. In this sense, they are arguably deserving of a heightened level of fiduciary care from the government. The government owes "double fiduciary" obligations to the Freedmen.

The treaties and ratified agreements pertinent here resulted in a continuing obligation on the part of the government to ensure that the Freedmen (and their descendants) receive the benefits to which they are entitled.

As stated above discovery is necessary in order to fully explore and establish the scope and nature of the duties owed by the government to the Freedmen, and that

therefore dismissal, at least at this stage of the proceedings, would be inappropriate. *E.g. Central Pines Land Co.*, 61 Fed. Cl. at 537 (court denied motion to dismiss mineral rights takings claim, premised on the allegation that the Government imposing restrictions and prohibitions on the plaintiffs' access to and use of their mineral rights, because "[a]t this preliminary state of the litigation, however, the Court lacks a sufficient factual record to decide Count II"); *Cherokee Nation of Oklahoma*, 21 Cl. Ct. at 572 ("In the present action, the court lacks facts sufficient to render a decision as to when the claims first accrued. The court will not allow defendant to persevere in a continuing wrong. Here defendants owe a continuous duty. The motion to dismiss should be overruled and Plaintiffs should be permitted to undertake discovery to establish the precise scope and nature of this duty.

Respectfully submitted,

s/Percy Squire, Esq.
Percy Squire, Esq. (0022010)
Percy Squire Co., LLC
514 S. High Street
Columbus, OH 43215
614-224-6528 Telephone
614-224-6529 Facsimile
psquire@sp-lawfirm.com
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served via electronic mail filing or U.S. Postal Service this 5th day of November, 2007, upon the following:

Jane Smith, Esq.
Attorney-Advisor
Bureau of Indian Affairs.
United States Department of the Interior
1849 C. Street
Washington, D.C. 20240

Daniel G. Steele
Attorney of Record for Defendant
Matthew J. McKeown
Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
PO Box 663
Washington, D.C. 20044-0663

*s/Percy Squire*
Percy Squire, Esq. (0022010)