# In the United States Court of Federal Claims

No. 06-907 L

(Filed: January 15, 2008)

\*     \*     \*     \*     \*     \*     \*

| | |
|---|---|
| HARVEST INSTITUTE                 \* <br> FREEDMAN FEDERATION, <br> BLACK INDIANS UNITED           \* <br> LEGAL DEFENSE FUND, and <br> WILLIAM WARRIOR,               \* <br><br>                 Plaintiffs,       \* <br>       v.                               \* <br><br> UNITED STATES OF AMERICA       \* <br><br>                 Defendants.       \* | Continuing Claims Doctrine; Statute of <br> Limitations; Subject Matter Jurisdiction; <br> Failure to State a Claim |

\*     \*     \*     \*     \*     \*     \*

      Percy Squire, Columbus, Ohio, for plaintiffs.

      Daniel G. Steele, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for defendant.

## ORDER AND OPINION

**HODGES**, Judge.

      Plaintiffs seek declaratory and monetary relief for an alleged breach of post-Civil War treaties between the United States and the Five Civilized Tribes.[1]  Defendant argues that plaintiffs' claims are barred by the statute of limitations, and that plaintiffs have not pointed to a government obligation that would entitle them to money damages.  Plaintiffs contend that the statute of limitations does not apply because of the continuing claims doctrine.

      Plaintiffs' claims are barred by the six-year statute of limitations.  The treaties in question do not provide a money-mandating remedy for their alleged violation.

## BACKGROUND

      The United States signed treaties with the five slave-owning tribes that fought with the

---

      [1] The Five Civilized Tribes were Seminole, Cherokee, Creek, Choctow, and Chicksaw.

Confederacy during the Civil War.  The treaties prohibited slavery and gave Freedmen equal rights as members of the Tribes.  While the treaties had a common purpose of ending slavery, the various treaties were not identical.  For example, the Seminole Treaty read,

> inasmuch as there are among the Seminoles many persons of African descent and blood, who have no interest or property in the soil, and no recognized civil rights, it is stipulated that hereafter these persons and their descendants, and such other of the same race as shall be permitted by said nation to settle there, shall have and enjoy all the rights of native citizens, and the laws of said nation shall be equally binding upon all persons of whatever race or color who may be adopted as citizens or members of said tribe.

14 Stat. 755, 756 (1866).

The Creek Treaty did not address specific property rights for Freedmen, but articulated the principle of equal rights for Freedman adopted into the tribes:

> [I]nasmuch as there are among the Creeks many persons of African descent, who have no interest in the soil, it is stipulated that hereafter those persons lawfully residing in said Creek country under their laws and usages . . . shall have and enjoy all the rights and privileges of native citizens, including an equal interest in the soil and national funds, and the laws of said nation shall be equally binding upon and give equal protection to all such persons, and all others, of whatever race or color, who may be adopted as citizens or members of said tribe.

14 Stat. 785, 786 (1866).

Article IV of the Cherokee Treaty stated:

> All of the Cherokees and freed persons who were formerly slaves to any Cherokee, and all free negroes not having been slaves, who resided in the Cherokee nation prior to June 1, 1861 [who decide not to remain in the Cherokee nation] . . . shall have the right to settle in and occupy the Canadian district . . . and will include a quantity of land equal to 160 acres for each person who so elect to reside in the territory . . . .

14 Stat. 799 (1866).  The treaty did not distinguish between Cherokees and Freedmen, but gave all members of the tribe equal rights to the allotment of land.

The Choctow and Chickasaw treaties provided that if the tribes made Freedmen members

of their tribes within two years, the United States would apportion $300,000 from a trust fund.[2] The adopted Freedmen would receive forty acre allotments once the Choctow and Chickasaw Indians made their selections of land.  If the tribes did not adopt their Freedmen, the United States would not apportion the $300,000 from the trust fund.  Instead, the Government would hold the funds in trust for those Freedmen the Government would move to other parts of the Indian Territory.  Freedmen who did not leave voluntarily were not entitled to any portion of the $300,000 trust and were not entitled to the forty acre allotments.  Neither tribe adopted Freedmen within two years.  The United States did not voluntarily remove any Freedmen to other parts of the Indian Territory.

Plaintiffs, on behalf of the Freedmen, allege that the Tribes did not allocate land properly according to the treaties, and therefore *the Government* did not enforce plaintiffs' rights under the 1866 treaties.  They seek the value of the land the Tribes allegedly did not turn over to their ancestors.[3]

## DISCUSSION

Lack of Subject Matter Jurisdiction

The statute of limitations bars plaintiffs' claims.  "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."  28 U.S.C. § 2501.  The date of ordinary accrual for a breach of a statutory or regulatory duty is the date when the wrong began.  *Menominee Tribe v. United States*, 726 F.2d 718, 721 (Fed. Cir. 1984), *cert. denied,* 469 U.S. 826 (1984).  "The statute of limitations is a jurisdictional limitation on the government's waiver of sovereign immunity and therefore must be construed strictly."  *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988).  A claim accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action."  *Brown Park Estates-Fairfield Development Company,* 127 F.2d 1449, 1455 (Fed. Cir. 1997).  Plaintiffs' alleged claims accrued at the latest in 1902.

---

[2] The Choctow's share of the trust would have been three-fourths; the remaining one fourth would go to the Chickasaws.

[3] The United States created various allotment agreements with the Five Civilized Tribes between 1898 and 1902.  Unlike the 1866 treaties, these agreements gave a numerical value to the allotments of land given to the tribes and Freedmen.  Plaintiffs do not allege a breach of the allotment agreements in either their complaint or amended complaint, so we do not reach the issue of whether the Government owed Freedmen an obligation under those agreements.  If the Government breached an obligation, plaintiffs would be time barred from recovery, because the allocation of land or omission thereof occurred at the latest in 1902.  Plaintiffs would have had six years from that date in which to bring a claim in this court.

3

Plaintiffs allege that the statute of limitations does not apply because of the continuing claims doctrine.  The continuing claims doctrine applies where a defendant owes "a continuing duty to [p]laintiffs, each of which gives rise to a separate cause of action. . . . Plaintiff[s'] claims [must be] inherently susceptible to being broken down into a series of independent and distinct wrongs, each having associated damages."  *Brown-Park Estates-Fairfield Development Company,* 127 F.3d 1449 at 1456 (citing *Friedman v. United States,* 159 Ct. Cl. 1, 8 (1962)). *See also Hatter v. United States*, 203 F.3d 795, 798 (Fed. Cir. 2000) (holding continuing claims doctrine applies "where periodic payments are to be made, each successive failure to make proper payments gives rise to a new claim."); *Baka v. United States*, 74 Fed. Cl. 692 (2006) (holding continuing claim arises where periodic payments from plaintiff's retirement pay could be divided into discrete wrongs each time the money was withheld).  There must have been multiple events for the doctrine to apply.  *Simmons v. United States,* 71 Fed. Cl. 188, 192 (2006) (stating that incorrectly placed boundary markers on an allotment on the Quinault Indian Reservation did not trigger the continuing claims doctrine even though the negative effects of the wrong continued).

Plaintiffs rely heavily on the court's ruling in *Mitchell v. United States*, 10 Cl. Ct. 63 (1986).  *Mitchell* involved the alleged government mismanagement of timber resources on tribal lands.  The court applied the continuing claims doctrine where the Government sold timber from tribal lands below market value and  failed to regenerate the timber on tribal lands after it was cut and sold.  The court found that for each sale of timber below market value and each year the Government did not regenerate timber, the Government breached its duty to act in the best interest of the Tribes.  *Mitchell*, 10 Cl. Ct. at 77.  *Mitchell* clearly differs from the facts here.

Plaintiffs cannot point to an "independent and distinct" occurrence that would create a "separate and continuous" cause of action.  Rather, plaintiffs claim that a new cause of action arose each day the Government failed to force the Tribes to properly allocate lands to Freedmen. Plaintiffs' counsel stated:

> This complaint is not based upon a single act or seminal event.  The allegations within the complaint are those that are required in accordance with the authority set forth in *Mitchell* that there has been a series of separate failures on the part of the United States to enforce the obligations of the various treaties set forth in the amended complaint upon which these claims are predicated and that a new claim arises each day.

(Tr. at 18-19.)  The one-time act of allotting lands to the Freedmen or omission thereof is distinguishable from recurring and periodic deductions from paychecks or periodic sales of timber from tribal lands below market value.  The continuing claims doctrine does not apply to plaintiffs' claims.

Failure to State a Claim

4

Plaintiffs did not state a claim upon which we could grant them relief.  To state a claim for relief, plaintiffs must "invoke a rights creating source of substantive law that can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *United States v. Mitchell,* 463 206, 216-17 (1983) (internal quotations omitted); *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003).  A claimant invoking the court's jurisdiction on the basis that the United States breached its trust must identify a statute, treaty, or regulation that imposes a fiduciary duty on the United States.  *United States v. Mitchell*, 445 U.S. 535, 542-43 (1980).

Plaintiffs concede that it is "not enough to rely on the general trust relationship between the Native Americans and the [G]overnment."  *United States v. Navajo Nation*, 537 U.S. at 506.  They point to *Navajo Nation* to suggest that the treaties did not have to be money-mandating for us to have jurisdiction.  To be money-mandating, a statute, regulation, or treaty must impose a specific obligation on the part of the Government.  This obligation may require performance or prevent it.  If the Government breaches that obligation, plaintiffs may be entitled to money damages.  The Court in *Navajo Nation* stated: "Those [obligations] need not, however, expressly provide for money damages; the availability of such damages may be inferred." *Id*.  Plaintiffs read this to mean that the Government's obligation may be inferred.  While the right to money damages may be inferred, the governmental obligation may not.

The 1866 treaties did not create a governmental obligation and we cannot infer one in the absence of specific language in the treaties.  At most, the 1866 treaties instructed the Five Civilized Tribes that all former slaves adopted as members of the tribes should be treated as equal members of the tribe and enjoy all the rights of native citizens.

The Chickasaw and Choctow Treaty did not vest property rights in their Freedmen and did not impose an obligation on the Government.  This treaty set a condition precedent which, if met, would give certain property rights to the Freedmen.  The Chickasaw and Choctow were required to adopt the Freedmen as members of the tribes within two years.  If the Chickasaw and Choctow did not adopt the Freedmen, the Freedmen would not be entitled to land allotments from the tribes.  Neither tribe adopted Freedmen as members.  Therefore, the condition precedent was not met and the property rights did not vest. [4]

---

[4] The issue of whether the Chickasaw Freedmen had property interests in land allotments under the 1866 Treaty was litigated in three cases.  *See Choctow Nation of Indians v. United States*, 318 U.S. 423, 425 (1943); *Chickasaw Freedmen v. United States*, 193 U.S. 115 (1904) (Chickasaw Tribe did not adopt Freedmen; therefore, the Freedmen were not entitled to benefits under the 1866 Treaty); *Casey-El v. United States*, 1991 WL 263714, 1 (Fed. Cir. 1991) (holding "[t]he doctrine of res judicata bars Casey-El from relitigating these claims to land or money under the 1866 Treaty. . . . The Supreme Court adjudicated the rights of the Chickasaw freedmen as a class. . . their ancestors were bound by the results of the Supreme Court case.").

**CONCLUSION**

The statute of limitations bars review of plaintiffs' claims on the merits.  If the Government breached an obligation to the Freedmen, it did so at the turn of the century in a single discrete act.  The continuing claims doctrine does not apply in such circumstances, so it does not protect plaintiffs' claims from the statute of limitations bar.  Plaintiffs did not show that the treaties, if breached, required the Government to pay money damages.

The Clerk of  Court will dismiss plaintiffs' Complaint for lack of jurisdiction and failure to state a claim, and enter judgment for defendant.  No costs.

SO ORDERED.

s/ Robert H. Hodges, Jr.
Robert H. Hodges, Jr.
Judge